113 P.3d 172

Daniel MORIMOTO, M.D.; and Kats
Yamada, Appellants–Appellants

v.

BOARD OF LAND AND NATURAL RE-
SOURCES, State of Hawai'i; Hawai'i
State Department of Transportation;
United States Department of Transpor-
tation, Appellees–Appellees.

No. 25169.

Supreme Court of Hawai'i.

May 23, 2005.

Daniel Morimoto, M.D., appellant-appellant, on the briefs, pro se.

Kats Yamada, appellant-appellant, on the briefs, pro se.

Edsel M. Yamada, Deputy Attorney General, on the briefs, for Appellee–Appellee Board of Land and Natural Resources.

Rosemary T. Fazio and Francis P. Hogan (Ashford & Wriston), Special Deputy Attorneys General, and Wayne A. Matsuura, Deputy Attorney General, on the briefs, for Appellee–Appellee State of Hawai'i, Department of Transportation.

Michael Chun, Assistant United States Attorney, on the briefs, for Appellee–Appellee United States Department of Transportation.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by ACOBA, J.

Appellants–Appellants Daniel Morimoto, M.D. (Morimoto) and Kats Yamada (Yamada), *pro se*, (collectively, Appellants), appeal from the May 28, 2002 judgment of the circuit court of the third circuit[1] (the court), affirming an administrative decision of Appellee–Appellee Board of Land and Natural Resources (BLNR). The BLNR's decision approved the application of Appellees–Appellees Hawai'i State Department of Transpor-

---

1. The Honorable Greg K. Nakamura presided.

tation and the United States Department of Transportation, Federal Highways Administration (FHA), (collectively, Appellees) for a conservation district use permit to upgrade Saddle Road in the County of Hawai'i. We affirm the court's order.

## I.

This appeal concerns BLNR's decision to grant a conservation district use permit (CDUP) for a project to upgrade State Highway 200, also known as Saddle Road, to a two-lane highway that would comply with the design of the American Association of State Highway and Transportation Officials for rural arterials and accommodate an expected increase in traffic flow along the highway.[2] A CDUP was required because the project proposed a realignment route, referred to as PTA–1,[3] that would traverse 206.70 acres of conservation district lands.[4]

PTA–1 was selected from amongst a list of alternative routes after Appellees and other government agencies completed an environmental impact statement (EIS) to comply with the National Environmental Policy Act, 42 U.S.C. §§ 4321–4370f, and Hawai'i Revised Statutes (HRS) chapter 343. The EIS incorporated a July 27, 1998 biological opinion (BO) issued by the United States Fish and Wildlife Service (FWS). The opinion represented a culmination of inter-agency consultation as required under section 7 of the Endangered Species Act (ESA), 16 U.S.C. § 1536.[5] Appellees had initiated section 7 consultation by requesting that FWS provide them with information on any "listed species"[6] or critical habitat[7] within the project area. Based upon the list of species provided by FWS, Appellees then conducted biological inventory surveys. A biological assessment (BA),[8] which addressed potential

2. The factual background herein, which is derived from BLNR's findings of fact, conclusions of law, and decision and order, is uncontested by the parties, unless so noted.

3. PTA refers to the Pohakuloa Training Area.

4. The Department of Land and Natural Resources (DLNR) is responsible for managing conservation districts and issuing permits for conservation districts. Hawai'i Revised Statutes (HRS) § 183C–3 (Supp.1994) provides, in pertinent part, that the DLNR shall

    ....

    (5) Establish categories of uses or activities on conservation lands, including allowable uses or activities for which no permit shall be required;

    (6) Establish restrictions, requirements, and conditions consistent with the standards set forth in this chapter on the use of conservation lands; and

    (7) Establish and enforce land use regulations on conservation district lands including the collection of fines for violations of land use and terms and conditions of permits issued by the [DLNR].

Additionally, HRS § 183C–6(a) (Supp.1994) provides that the DLNR "shall regulate land use in the conservation district by the issuance of permits."

5. Under section 7(a)(2) of the ESA,

    [e]ach Federal agency shall, in consultation with and with the assistance of the Secretary [of the Interior], insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened

species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical[.]

16 U.S.C. § 1536(a)(2). This process is referred to as section 7 consultation.

6. "Listed species" are legally protected species designated by the FWS as endangered, threatened, proposed endangered, and proposed threatened.

7. Section 3(5)(A) of the ESA defines "critical habitat" as

    (i) the specific areas within the geographical area occupied by the species, at the time it is listed in accordance with the provisions of [Section 4 of the ESA], on which are found those physical or biological features (I) essential to the conservation of the species and (II) which may require special management considerations or protection; and

    (ii) specific areas outside the geographical area occupied by the species at the time it is listed in accordance with the provisions of [Section 4 of the ESA], upon a determination by the Secretary that such areas are essential for the conservation of the species.

16 U.S.C. § 1532(5)(A) (2004). Section 4 of the ESA, entitled "Determination of endangered species and threatened species," authorizes and outlines the process for determining "whether any species is an endangered or a threatened species." 16 U.S.C. § 1533(a)(1). *See generally* 16 U.S.C. § 1533.

8. Pursuant to section 7(c) of the ESA,

*impacts* of the realignment project on the listed species, was prepared by Appellees.

Seven of the endangered/threatened species evaluated in the BA are relevant to this appeal. Specifically, the BA established that (1) moderate numbers of the Hawaiian Hoary Bat ('Ōpe'ape'a) were observed, (2) a single Palila (finch-billed honeycreeper) was detected, although three other sightings were previously documented, (3) no 'Akiapōlā'au were observed, but two sightings were previously documented, (4) Nēnē used the area on a regular and incidental basis, (5) during breeding season, the Dark-rumped Petrel ('Ua'u) was seen flying over the area, (6) two populations of *Silene hawaiiensis* (a sprawling shrub known to exist only on the Island of Hawai'i) were located in the area, and (7) there was a possibility that the Hawaiian Hawk ('Io) would use the area for nesting, although none was detected. Based upon these findings, the BA concluded that (1) it would be "unlikely" that the realignment project would have a deleterious impact on the Hawaiian Hoary Bat and the Nēnē, (2) fire posed a threat to the 'Akiapōlā'au, Palila, and *Silene hawaiiensis,* and (3) lighting used in the project might disorient the Dark-rumped Petrel.

The BO issued by FWS, largely based upon the information in the BA, observed that two of the species, the Palila and *Silene hawaiiensis,* required specific attention. Thus, the BO included a detailed plan to offset damage to Palila critical habitat and minimize effects on the species. To mitigate the approximately 100 acres of Palila critical habitat taken up by the construction of PTA–1, the plan called for, *inter alia,* the acquisition and management of approximately 10,-000 acres for Palila habitat restoration and an attempt to reintroduce the Palila to areas within their historic range where they had not resided. Appellees, BLNR, and other agencies signed a memorandum of under-

standing (MOU) to implement the Palila mitigation plan. With respect to the *Silene hawaiiensis,* the proposed alignment path was moved south to avoid a population of seventy plants.

The BO also incorporated the following additional mitigation measures, which FWS considered to be part of the proposed project: (1) lighting restrictions to avoid potential downing of the Dark-rumped Petrels; (2) a plan for minimizing fire hazards; and (3) with respect to the Hawaiian Hawk, "nest searches" by a qualified ornithologist prior to the onset of construction and, in the event an "active nest" is detected, the halting of the project within one kilometer of the nest and the initiation of consultation with FWS. Ultimately, the BO concluded as follows:

> After reviewing the current status of the [P]alila and its critical habitat and the current status of *Silene hawaiiensis,* the environmental baseline of the species in the action area, and the effects of the proposed Saddle Road Realignment and Improvement Project, including the cumulative effects, it is [FWS's] biological opinion that the Saddle Road Realignment and Improvement Project is not likely to jeopardize the continued existence of the [P]alila or *Silene hawaiiensis* and is not likely to adversely modify [P]alila critical habitat. These findings are based in large part on the conservation measures built into the project by [FHA]. . . . [FWS] believes that the mitigation measures built into the project design by [FHA] will offset the modifications being made to [P]alila critical habitat and enhance the likelihood of survival and recovery of the [P]alila.

In October 1999, at the close of the EIS process and section 7 consultation, FHA issued a record of decision (ROD) [9] that (1) confirmed PTA–1 as the selected route and (2) legally bound Appellees to implement the mitigation commitments delineated in the

each Federal agency shall ... request of the Secretary information whether any species which is listed or proposed to be listed may be present in the area of such proposed action. If the Secretary advises, based on the best scientific and commercial data available, that such species may be present, such agency shall conduct a biological assessment for the purpose of

identifying any endangered or threatened species which is likely to be affected by such action.

16 U.S.C. § 1536(c).

9. According to BLNR finding no. 56, the "ROD is a legally binding document that ensures implementation of the commitments of the EIS."

EIS and the BO. The ROD also required Appellees to incorporate the mitigation commitments into all construction contract documents. The mitigation plan in the ROD received wide support from scientific, regulatory agency, and environmental communities, and segments of the local community.

## II.

Appellees filed their application for a CDUP on January 21, 2000. The application included a draft EIS as required under Hawai'i Administrative Rules (HAR) § 13–5–31(a)(1)[10] and noted that a ROD would be issued in November 1999.[11] As mentioned previously, the BO was included in the EIS.[12] On April 24, 2000, BLNR held a public hearing on the application. At the public hearing, Yamada orally requested a contested case hearing to challenge Appellees' application. Morimoto was permitted to intervene in the contested case on November 20, 2000. The contested case hearing was held on February 12, 13, and 14, 2001, with a hearings officer presiding. On May 8, 2001, the hearings officer issued his proposed findings of fact, conclusions of law, and decision and order.

On July 9 and 27, 2001, Yamada filed the following four motions, in which Morimoto joined: (1) a motion to determine that mitigation for use of a portion of the Palila critical habitat cannot be used as a justifica-

tion for the issuance of a CDUP; (2) a motion to determination the existence of nine endangered and threatened species in or near PTA–1; (3) a motion to determine that a sixty-meter-wide survey is not legally sufficient; and (4) a motion to comply with HAR § 13–1–40(c).[13]

On October 4, 2001, BLNR issued its findings of fact (findings), conclusions of law (conclusions), and decision and order granting the CDUP to Appellees subject to fifteen conditions. In conclusion no. 2, BLNR determined that Appellees' application "satisfie[d] the requirements set forth in HAR Section 13–5–30(c)." Its decision and order provided in part that

*[a]ll mitigation measures set forth in the application materials and in the Final Environmental Impact Statement* for this project, including but not limited to:

- implementation of the fire and other environmental commitments identified in the Record of Decision;
- Palila mitigation at the Ka 'ohe lease area;
- Palila mitigation at Pu 'u Ma[li];
- Palila mitigation at Kipuka 'Alala; and
- a continuing study of the *[S]ilene hawaiiensis* [be] hereby incorporated as conditions of the permit.

(Emphasis added.) BLNR also denied Yamada's four motions in conclusion no. 7.[14]

---

**10.** HAR § 13–5–31(a)(1) (1994) provides, in relevant part, as follows:

§ 13–5–31 *Permit Applications.* (a) Applications for all permits provided for in this chapter shall be submitted to the department on the form prescribed by the department. The application shall contain:

(1) A draft environmental assessment, or environmental impact statement, as applicable[.]

**11.** The application also noted that the realignment project "has been the subject of an [EIS] in accordance with the National Environmental Policy Act of 1969 as amended (NEPA) and [HRS] Chapter 343 . . . . A federal Record of Decision is scheduled to be issued in November 1999."

**12.** BLNR established this fact in finding no. 96, which is uncontested by the parties.

**13.** HAR § 13–1–40(c) (1982) states as follows:

§ 13–1–40 *Decisions and orders.*

. . . .

(c) Every decision and order adverse to a party to the proceeding, rendered by the board in a contested case, shall be in writing or stated in the record and shall be accompanied by separate findings of fact and conclusions of law. If any party to the proceeding has filed proposed findings of fact, the board shall incorporate in its decision a ruling upon each proposed findings [sic] so presented.

**14.** Conclusion no. 7 stated as follows:

The motions of [Yamada] are denied. [His] motion to determine that mitigation for use of a portion of the Palila critical habitat cannot be used as a justification for the issuance of the CDU[P], a motion to determine the existence of nine endangered and threatened species in or near PTA–1, and motion to determine that a 60 meter survey is not legally sufficient largely represent arguments set out in [Yamada's] proposed findings of fact and conclusions of law

### III.

On October 23, 2001, Appellants filed an appeal of BLNR's decision to the court pursuant to HRS § 91–14 (1993).[15] In its resulting decision and order, the court ruled:

1. The BLNR's mixed finding of fact and conclusion of law that the *use of the land as a roadway will not cause substantial adverse impact upon endangered and threatened species is not clearly erroneous.*

. . . .

2. *The BLNR did not commit an error of law when it considered mitigation measures relating to the Paula [ (sic)] in determining that there will not be a substantial adverse impact to existing natural resources within the surrounding area, community or region.*

. . . .

[3]. The BLNR's denial of Appellant Yamada's motions does not warrant reversal of the BLNR decision.

. . . .

[4]. The BLNR decision does not violate Article IX, Section 1 of the Hawai'i Constitution and Public Trust Doctrine.[[16]]

(Emphases added.) With respect to ruling (2), the court observed as follows:

First, in *Stop H–3 Association v. State,* 68 Haw. 154, 706 P.2d 446 (1985), the Hawai'i Supreme Court stated that the BLNR could allow a use within a conservation district by conditioning approval "on compliance with measures mitigating the

environmental consequences to the area." *Id.,* [sic] 68 Haw. at 163, 706 P.2d 446. Therefore, there is a *suggestion* by the Hawai'i Supreme Court that the grant of a conservation district use permit may be based upon conditions requiring mitigation measures.

(Emphasis added.)

The court issued its final judgment affirming the BLNR's decision on May 28, 2002. On June 17, 2002, Appellants filed a notice of appeal.

### IV.

On appeal, we list the separate arguments raised by Appellants in related order, numbered consecutively for convenience. Yamada argues that (1) "mitigation cannot be used to qualify the applicant for a CDUA permit since it is a new rule requiring adoption pursuant to HRS 91–3"; (2) "the lower court's determination that mitigation is permitted is in error" because (a) "the inclusion of the standard conditions in HAR 13–5–42 does not permit the Board to mitigate the impact of the proposed land use to qualify the applicant for the CDUA permit," (b) "mitigation of the criteria for the issuance of the CDUA was not permitted by *Stop H–3 [Ass'n v. State Dept. of Transp.,* 68 Haw. 154, 706 P.2d 446 (1985),]," (c) "the Board cannot interpret its own rules in a way that it includes provisions not otherwise permitted by its rules," and (d) "the proposed land use of the Palila critical habitat which also houses eight other endangered and threatened spe-

---

and [his] objections to the Hearing Officer's D & O. While *untimely filed,* [BLNR] allowed [him] to make arguments on the motions at oral argument. [Yamada's] motion to comply with Rule 13–1–40(c), HAR, is denied. *The format of [his] proposed findings of fact and conclusions of law in unnumbered textual paragraphs made it difficult for the Hearing Officer and [BLNR] to address [his] concern.* To the extent not addressed by the Hearing Officer or this Decision and Order, [BLNR] finds that the proposed findings of fact and conclusions of law are denied.
(Emphases added.)

15. HRS § 91–14(a) provides that "[a]ny person aggrieved by a final decision and order in a contested case . . . is entitled to judicial review thereof under this chapter[.]"

16. In this jurisdiction, the Public Trust Doctrine has been adopted as a "fundamental principle of constitutional law," *In re Water Use Permit Applications (Waiahole),* 94 Hawai'i 97, 132, 9 P.3d 409, 444 (2000), and is derived from Article XI, section 1 of the Hawai'i Constitution. Article XI, section 1 provides that:

For the benefit of present and future generations, the State and its political subdivisions shall conserve and protect Hawaii's natural beauty and all natural resources, including land, water, air, minerals and energy sources, and shall promote the development and utilization of these resources in a manner consistent with their conservation and in furtherance of the self-sufficiency of the State.

All public natural resources are held in trust by the State for the benefit of the people.

cies is not consistent with the legislative purpose of conserving and protecting those lands"; Morimoto argues that (3) "the BLNR committed an error of law when it considered mitigation measures relating to the Palila in determining that there will not be a substantial adverse impact to existing natural resources within the surrounding area, community or region"; Yamada further argues that (4) "the presence of nine endangered and threatened species found in and adjacent to the PTA–1 Corridor requires that the entire area be protected from the proposed use"; (5) "Applicants only conducted a 60 meter roadway corridor survey and as a result failed to demonstrate that they have met criteria required of HAR 13–5–30(c)(4)"; Morimoto further argues that (6) "the BLNR mixed finding of fact and conclusion of law that the proposed roadway will not cause a substantial adverse impact upon endangered and threatened species is clearly erroneous"; (7) "the BLNR's denial of [Yamada's] motions warrants reversal of the BLNR decision," and (8) "the BLNR decision violates Article XI, section 1 of the Hawai'i Constitution and the public trust doctrine." Ultimately, Appellants seek reversal of the court's decision and denial of the CDUP.

V.

■ " 'Review of a decision made by a court upon its review of an administrative decision is a secondary appeal. The standard of review is one in which this court must determine whether the court under review was right or wrong in its decision.' " *Lanai Co. v. Land Use Comm'n*, 105 Hawai'i 296, 306–07, 97 P.3d 372, 382–83 (2004) (quoting *Soderlund v. Admin. Dir. of the Courts*, 96 Hawai'i 114, 118, 26 P.3d 1214, 1218 (2001)).

HRS § 91–14(g) sets forth the appropriate standards for reviewing agency decisions. It provides that a court may reverse or modify a decision and order of an agency if the order is:

(1) In violation of constitutional or statutory provisions; or

(2) In excess of the statutory authority or jurisdiction of the agency; or

(3) Made upon unlawful procedure; or

(4) Affected by other error of law; or

(5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

(6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

This court noted in *Bragg v. State Farm Mut. Auto. Ins. Co.*, 81 Hawai'i 302, 304–05, 916 P.2d 1203, 1205–06 (1996), that "[u]nder HRS § 91–14(g), conclusions of law are reviewable under subsections (1), (2), and (4) ... findings of fact are reviewable under subsection (5); and an agency's exercise of discretion is reviewable under subsection (6)." Morimoto cites to the foregoing sections and Yamada cites to the aforesaid right/wrong standard.

■ In an appeal from a circuit court's review of an administrative decision, "the clearly erroneous standard governs an agency's findings of fact[.]" *Lanai Co.*, 105 Hawai'i at 307, 97 P.3d at 383 (internal quotation marks and citation omitted). "An agency's findings are not clearly erroneous and will be upheld if supported by reliable, probative and substantial evidence unless the reviewing court is left with a firm and definite conviction that a mistake has been made." *Poe v. Hawai'i Labor Relations Bd.*, 105 Hawai'i 97, 100, 94 P.3d 652, 655 (2004) (internal quotation marks and citation omitted). "Substantial evidence is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." *Lanai Co.*, 105 Hawai'i at 308–09, 97 P.3d at 384–85 (internal quotation marks and citations omitted). "[T]he courts may freely review an[ ] agency's conclusions of law." *Id.* at 307, 97 P.3d at 383 (internal quotation marks and citation omitted).

VI.

A.

■ In Argument 1, Yamada maintains, in effect, that mitigation measures cannot be considered in reviewing the application for a CDUP, unless a new rule concerning mitigation is adopted pursuant to HRS § 91–3. He

points out that no rule exists giving BLNR authority to consider mitigation measures because HAR § 13–5–30(c)(4) refers to the impact on *"existing* natural resources." (Emphasis added.) Hence he maintains that "HAR 13–5–30(c)(4) only commands the [BLNR] to determine if the proposed land use will cause [such] substantial impact" without consideration of palliative measures.

It may be noted, first, that while HAR § 13–5–30(c)(4) does not refer to mitigation, mitigation is contemplated in another rule within the same subchapter.[17] HAR § 13–5–42(a)(9) states that "[a]ll representations *relative to mitigation* set forth in the accepted environmental assessment [ (EA)] or impact statement [ (EIS)] for the proposed use *are incorporated as conditions of the permit* [.]" (Emphases added.) As stated previously, HAR § 13–5–31(a)(1) required Appellees to submit an EIS as part of their CDUP application. Included in the EIS was the BO prepared by FWS.[18]

In that regard, the BO made clear that FWS's finding of "no jeopardy" to the Palila and *Silene hawaiiensis* and "no adverse modification" to Palila critical habitat was "based in large part on the conservation measures built into the project by [FHA]." By requiring that mitigation measures set forth in the EIS be made part of the conditions of the permit, HAR 13–5–42(a)(9) not only authorized, but legally mandated the BLNR to consider such measures in reviewing the application.

Yamada's position that BLNR could not consider mitigation measures set forth in an EA or EIS would negate HAR § 13–5–42(a)(9), which makes mitigation in an EA or EIS an automatic condition of a CDUP. We must give effect to both rules. *Topliss v. Planning Comm'n,* 9 Haw.App. 377, 391 n. 11, 842 P.2d 648, 657 n. 11 (1993) ("[A]dministrative rules must be read so as to give them effect." (Citing *State v. Tom,* 69 Haw. 602, 752 P.2d 597 (1988).)). In that light, Appellants' narrow interpretation of HAR § 13–5–30(c)(4) must be rejected.[19] Hence, Yamada's Arguments 2(a), stating that "the inclusion of the standard conditions in HAR 13–5–42 does not permit the Board to mitigate the impact of the proposed land use to qualify the applicant for a CDUA permit," and 2(c), stating that "the Board cannot interpret its own rules in a way that includes provisions not otherwise permitted by its rules," must be likewise rejected.

Moreover, as BLNR noted in its findings nos. 56, 58, and 121 and conclusion no. 43,[20] Appellees were legally bound to implement the mitigation measures in the BO and EIS. Hence, these measures were already part of the realignment project when it came before BLNR. The application thus was inclusive of the mitigation measures as it was presented to the Board. Consequently, the proposal

---

17. Title 13 chapter 5 of the HAR, entitled "Conservation District," governs the regulation of "land use in the conservation district for the purpose of conserving, protecting, and preserving the important natural resources of the State through appropriate management and use to protect their long-term sustainability and the public health, safety, and welfare." HAR § 13–5–1 (1994). Subchapter 4 of chapter 5, title 13, delineates the procedures for permits, site plan approvals, and management plans. HAR § 13–5–30(c), establishing the CDUP criteria, and HAR § 13–5–42(a), establishing standard conditions for CDUPs, both fall within subchapter 4.

18. *See supra* note 12.

19. This opinion does not address whether the rules authorize BLNR to consider mitigation measures independent of an EA or EIS in issuing CDUPs, or to, in Yamada's words, "mitigat[e] the criteria."

20. Appellants do not challenge BLNR's findings nos. 56, 58, and 121, which establish that the

"ROD is a legally binding document that ensures implementation of the commitments of the EIS[,]" that the "ROD describes the environmental mitigation commitments that must be implemented by [FHA], in full cooperation with all effected regulatory agencies," that FHA "will incorporate these commitments into the construction contract documents as requirements of the contractor and subcontractors," that these "commitments will be enforced by the [FHA] Project Engineer[,]" and that FHA "has made legally binding commitments in the ROD to undertake significant mitigative steps to offset any potential impacts on Palila critical habitat." Appellants also do not contest BLNR's conclusion no. 43, which states that the "comprehensive conditions to the implementation of the project imposed by the ROD, which are legally binding upon [FHA] in order for the project to proceed, protect and enhance the natural environmental, cultural, historical and other resources."

with the incorporated measures required by HAR 13–5–42(a)(9) would come within the meaning of the phrase "proposed land use" in HAR § 13–5–30(c)(4). Under these circumstances, BLNR had the authority to consider the mitigation measures in the BO, EIS, and ROD in evaluating Appellees' CDUP application without undertaking further rulemaking.

## B.

We observe that the policies underlying rulemaking, as announced in *Aluli v. Lewin*, 73 Haw. 56, 828 P.2d 802 (1992), and *Hawaii Prince Hotel Waikiki Corp. v. City & County of Honolulu*, 89 Hawai'i 381, 974 P.2d 21 (1999), are not implicated in this case. In those cases, this court sought to ensure that permit applications "be reviewed fairly and consistently," *Aluli*, 73 Haw. at 61, 828 P.2d at 805, and that agency discretion be exercised "fairly and uniformly," *Hawaii Prince Hotel*, 89 Hawai'i at 393, 974 P.2d at 33. Both decisions observed that without rulemaking,

> the affected public cannot fairly anticipate or address the procedure as there is no specific provision in the statute or regulations which describe the determination process. *The public and interested parties are without any firm knowledge of the factors that the agency would deem relevant and influential in its ultimate decision.* The public has been afforded no meaningful opportunity to shape these criteria that affect their interest.

*Id.* (quoting *Aluli*, 73 Haw. at 60, 828 P.2d at 804) (emphasis added).

Here, when an applicant submits its application for a CDUP, the public and interested parties know that BLNR will evaluate the application in accordance with the eight criteria in HAR § 13–5–30(c), that BLNR will look to any draft EIS or EA that must be submitted as part of the application, and that BLNR will incorporate any representations in the EIS or EA (relevant to mitigation) as a condition of the CDUP. These rules provide sufficient guidance to CDUP applicants and the public, offsetting the threat of "unbridled discretion." *Aluli*, 73 Haw. at 61, 828 P.2d at 805.

## C.

As noted in Argument 2(b), Yamada asserts that the court erred because "mitigation … for the issuance of the CDU[P] was not permitted by *Stop H–3* [.]" In its decision and order, the court made reference to *Stop H–3*. Although similar to this case in some respects, *Stop H–3* is not germane. The appellants in *Stop H–3* argued that BLNR "exceeded its authority" in approving the H–3 North Halawa Valley realignment. 68 Haw. at 158, 706 P.2d at 450. The appellants there claimed that "H–3 will so drastically compromise the integrity of the conservation district that use of the regulation [at issue, HAR § 13–2–11(c)(8) (1984),] … [was] absolutely precluded *under the enabling statute.*" *Id.* at 161, 706 P.2d at 451 (emphasis added). Thus, this court restricted its inquiry to whether the applicable statute, HRS § 183–41, authorized the issuance of the CDUP.

In the instant case, Appellants do not challenge BLNR's statutory authority to grant the CDUP. Rather, Appellants maintain that BLNR had to comply with HRS § 91–3 rulemaking procedures before it could consider mitigation in evaluating the CDUP application. Thus, *Stop H–3* is not applicable. Nevertheless, for the reasons stated herein, the court was ultimately correct in affirming the BLNR's October 4, 2001 order. *See Lanai Co.*, 105 Hawai'i at 306, 97 P.3d at 382 (affirming the court's order but on alternate grounds (citing *Taylor–Rice v. State*, 91 Hawai'i 60, 73, 979 P.2d 1086, 1099 (1999) ("[T]his court may affirm a judgment of the trial court on any ground in the record which supports affirmance."))).

## VII.

As to Argument 2(d), Yamada maintains that "[t]he proposed land use of the [P]alila critical habitat is not consistent with … legislative purpose[.]" For this proposition, Yamada cites to (1) HAR § 13–5–1 which states, *inter alia*, that "the purpose of this chapter is to require land use in the conservation district for the purpose of conserving, protecting, and preserving the important natural resources of the State"; (2) HRS § 195D–2, which defines "conserv-

ing"; [21] (3) *Palila v. Hawaii Dep't of Land & Natural Res.*, 649 F.Supp. 1070, 1076 (D.Haw.1986) ("Thus, one of the main purposes of the [Endangered Species Act] was conservation and preservation of the ecosystems upon which endangered species depend."); and (4) HRS § 195D–5(b) (1993) (stating that "the office of the governor shall review other programs administered by the [Department of Land and Natural Resources], and to the extent practicable, utilize such programs in furtherance of the purposes of this section").

Yamada argues that "to the extent that there are conflicts in the rules and statutes, the latter must prevail," but does not set out the specific way in which the foregoing authorities were violated. Thus, we do not decide this contention. *Norton v. Admin. Dir. of the Court,* 80 Hawai'i 197, 200, 908 P.2d 545, 548 (1995) (noting that a point of error may be disregarded if the appellant fails to present a discernible argument (citing *Hall v. State,* 10 Haw.App. 210, 218, 863 P.2d 344, 348,) *cert. denied,* 76 Hawai'i 246, 75 Haw. 581, 868 P.2d 464 (1993), *recon. denied,* 80 Hawai'i 357, 910 P.2d 128 (1996)).

## VIII.

■ As to Argument 3, Morimoto contends that consideration of mitigation measures was error because the BLNR failed "to specify the impact[,] . . . to specify the diminution[,] . . . to address other endangered species[, and] . . . engaged in new rule-making." [22] Relatedly, Yamada asserts as to Argument 4, that the entire area must be protected from the project. He remonstrates that (1) Appellees were not aware of *Asplenium fragile,* (2) findings 115–141 only deal

with the Palila mitigation plan and "the criteria [of the HAR] requires examining the impact to the existing natural resources[,]" (3) there was no demonstrative evidence presented that the use met the criteria in HAR 13–5–20(c), (4) the survey was limited to the PTA–1 corridor and not to the surrounding area,[23] (5) one-hundred acres of habitat lands are being removed from the other eight endangered and threatened species but there are no mitigation land being proposed for those species.

### A.

As to Morimoto's first and second and Yamada's second concerns, we have said, *supra,* that, in the circumstances of this case, BLNR must consider proposed ameliorative steps in evaluating the substantial adverse impact criterion. Contrary to Morimoto's argument, the findings regarding Palila mitigation are responsive to the perceived *impact* of the realignment project upon the species. BLNR found, in finding no. 117, that "a small portion of Palila critical habitat . . . must be used" for the project. Finding no. 120 noted that "[n]o Palila have resided in the portion of the Palila critical habitat located in the environs of PTA–1 (PTA Training Areas 1–4) for decades." [24] Finally, finding no. 121, expressly referencing impacts, recognized that Appellees have "made legally binding commitments in the ROD to undertake significant mitigative steps to offset any potential impacts on Palila critical habitat." These findings, in addition to other findings that explain Appellees' mitigation commitments, dispel Appellants' argument that BLNR did not consider the *impact* or the

---

21. HRS § 195D–2 (1993) states that "[c]onserve", "conserving", and "conservation" mean to use and the use of all methods and procedures for the purpose of increasing and maintaining populations of aquatic life, wildlife, and land plants. Such methods and procedures include, but are not limited to, activities such as research, census, habitat acquisition, protection, maintenance, propagation, live trapping, regulated taking, law enforcement and transplantation[.]

22. Appellants' arguments as to rulemaking were addressed in the preceding section and, thus, are not discussed further.

23. This contention is treated in Part IX, in the discussion of the fifth Argument.

24. Yamada argues that finding no. 120 is erroneous because the draft EIS and the final EIS note a Palila sighting close to the eastern boundary of PTA–1 as well as other documented sightings in the general areas of PTA–1 during the past five years. However, these sightings were few and not inconsistent with the finding that no Palila have *resided* within PTA–1 for decades.

effect of measures to "dimin[ish]" the impact of the project upon the Palila.

### B.

As to other endangered or threatened species, Morimoto's third and Yamada's first, second, third, and fifth concerns, the court determined that "although some listed species were not specifically mentioned in the BLNR findings of fact, evidence presented would support specific findings that they will not suffer a substantial adverse impact as a result of the construction of PTA–1." Based upon a review of the record, including the BA, BO, and ROD, the court was ultimately correct in concluding that substantial evidence existed to support the finding that these species would not suffer substantial adverse impact.

In finding no. 102, BLNR stated that, "[i]n general, the extensive mitigation commitments enumerated in the ROD will ensure that the Saddle Road improvement project, including the construction of PTA–1, will have no substantial adverse impacts on any rare or listed species, and in fact will improve the current environmental situation." Thus, even though BLNR did not render specific findings as to each species, it did examine the mitigation commitments in the ROD to arrive at the conclusion that the project would not have a substantial adverse impact on listed or rare species.

### 1.

We note, in that regard, that the BA and BO expressly addressed seven of the nine species identified by Appellants according to the list provided to them by FWS.[25] Specifically, the BA noted the detection of moderate numbers of the Hawaiian Hoary Bat, the detection of a lone Palila and three other documented sightings, two documented sightings of 'Akiapōlā'au, regular incidental usage of the PTA–1 area by Nēnē, the overflying of the Dark-rumped Petrel during breeding season, two populations of *Silene hawaiien-*

*sis,* and the possible nesting of the Hawaiian Hawk, although none were detected. The BA concluded it would be "unlikely" that the realignment project would have a deleterious impact on the Hawaiian Hoary Bat and the Nēnē, but that fire posed a threat to the 'Akiapōlā'au, Palila, and *Silene hawaiiensis.* In response, the ROD requires that a fire ecologist be contracted to develop a comprehensive fire management plan to reduce the risk of fire in the vicinity of PTA–1. To avoid harm to a population of seventy *Silene hawaiiensis* plants within PTA–1, the proposed path was moved south of the population. As for the Dark-rumped Petrel, which returns to its nesting colony after dark, the BA noted that the major threat to these birds would be disorientation by light. Thus, the BO required that no construction or unshielded equipment maintenance be permitted after dark during breeding season and that this prohibition be incorporated into the construction contract documents.

With respect to the Hawaiian Hawk, even though none of these birds were detected during the surveys, the BA noted a potential impact upon the species if a nest was located near the construction corridor. Thus, the BA called for a "nest search" by a qualified ornithologist prior to the onset of construction and, in the event an active nest was detected during construction, the BO mandated that construction halt within one kilometer of the nest until consultation with FWS could take place.

### 2.

■ Appellees identified two species—the *Asplenium fragile* and the Pueo—as not being surveyed or addressed in the BA and BO. However, the record suggests that these species do not exist in PTA–1. Reginald David, who prepared the BA, testified that *Asplenium fragile,* an endangered plant species, was not found within PTA–1 and was not addressed in the BO. Yamada relied on *Rare Plants of Pohakuloa Training Area* by Rob-

---

25. As previously noted, FHA initiated section 7 consultation by sending a letter to FWS requesting information on the known presence of "listed species" or critical habitat within the general project area. On December 27, 1990, FWS re-

sponded by providing a list of species potentially impacted by the project. These facts were established in BLNR's findings nos. 81 and 83 and are uncontested by the parties.

ert B. Shaw to establish the existence of the *Asplenium fragile* in the project area. Lena Schnell, a natural resources specialist at Pohakuloa Training Area, testified that the species exists in the area, but that she was "not exactly certain where." She also stated that she did not use Shaw's maps to conduct botanical surveys. The only evidence of a Pueo sighting came from the testimonies of Yamada and Dr. Harvey Chan, who, while on a hunting excursion, saw an owl cross the road in front of their truck. Thus, the fact that the BA or BO did not report on the *Asplenium fragile* or Pueo would not affect BLNR's ultimate decision regarding *substantial* adverse impact of the project. Based on the record, substantial evidence existed to support a finding that the species concerned would not suffer substantial adverse impact.

### IX.

As to Argument 5, Yamada declares that an adequate survey for endangered species was not conducted. Appellants point to the testimony of David and a representation made in the EIS. David did testify that his survey of the avian and mammalian species was limited to the corridor "where the road goes." The final EIS stated that "Species inventories were conducted by means of 100–percent pedestrian surveys within the 60–m wide corridor."

However, as Appellees point out, David also testified that the surveys on which the BA, BO, and ROD are based considered the entire area of the project, not just the roadway. For instance, David testified that his survey team "*went outside the alignment and searched all areas* of likely habitat, rocky outcroppings, rain cuts in valleys and any promising looking areas that given their many years of experience they would expect to find remnant endangered species in." Upon examination of the BA, BO, and ROD, it does not appear that the surveys were limited to a sixty-meter wide area where the road would traverse but, rather, that the area surrounding PTA–1 was surveyed. As BLNR noted in findings 86 and 87, which

were not disputed, "[t]he bulk of the listed species" were found in "*the area surrounding PTA–1*" and the survey covered PTA Training Areas 22 and 23, which are "located on the western and southern portions of PTA, *distant from the route selected for the proposed PTA–1 realignment.*" (Emphases added.)

### X.

As to Argument 6, Morimoto contends that (1) there is no mention of HRS §§ 195D–1, 195D–2, 344–4(3), and HAR § 13–5–30 in the BLNR's decision, (2) "a complete survey ... cannot be accomplished by simply doing a walk-through survey," (3) "disturbance would not be limited to construction events, but also includes the use of the proposed roadway," (4) "nine endangered species ... were not surveyed," (5) "[t]he Applicant has not demonstrated a benefit to the Palila in the proposed Mitigation," and (6) "the [mitigation] plan [is] illusory" since "[e]ffort alone can never become the standard for the proper care and preservation of our conservation land and endangered species" and " 'other approaches' are nowhere specified."

Only the fifth and sixth concerns need be discussed.[26] Morimoto takes issue with finding no. 137, which states that "the Palila Mitigation Plan does not require that Palila actually be reintroduced/translocated into areas where they do not presently reside. The Mitigation Plan merely requires that the effort be made." Morimoto argues that "[e]ffort alone can never become the standard for the proper care and preservation of our conservation land and endangered species. With mere effort alone, the applicant cannot demonstrate benefit to the Palila."

However, despite the fact that translocation may not be successful, BLNR found, in finding no. 137, that if the effort to translocate "does not ultimately appear successful, *other approaches will be tried.*" (Emphasis added.) Morimoto does argue that the approaches are not defined. But the mitigation

---

**26.** As previously noted with respect to (1), specific violations of the statutes were not identified and HAR 13–5–30 has been discussed above; (2) has been disposed of with Argument 5; and (3) and (4) were incorporated in the discussion on Arguments 3 and 4.

plan involves more than translocation. In finding no. 138, BLNR found that the "project will not harm, and in fact will benefit the Palila, by restoring degraded areas of Palila habitat[,] ... [and] *re-establishing mamane forest on parts of its former range.*" (Emphasis added.) The plan calls for the re-vegetation of approximately 10,000 acres of mamane forest. Thus, even though translocation of the Palila may not succeed, there is substantial evidence that the Palila will benefit in other ways, supporting BLNR's finding that the project will not harm the species. The finding, therefore, that the Saddle Road realignment would not cause substantial adverse impact to any rare or listed species was not clearly erroneous.

## XI.

As to Argument 7, Morimoto asserts that BLNR erred when it denied Yamada's motions (1) to determine that Palila mitigation cannot be used as justification for the issuance of the CDUP, (2) to establish the existence of nine endangered and threatened species in or near PTA–1, (3) to determine that a sixty-meter survey was not legally sufficient, and (4) for compliance with HAR § 13–1–40(c), *see supra* note 13.[27] The court stated that "the denial of the motions were in the nature of decisions not to adopt certain substantive arguments raised by Appellant Yamada. Since the BLNR decison [decision] is being affirmed herein, the denial of these motions were proper." For the reasons noted above, we also affirm BLNR's denial of Yamada's motions.

## XII.

■ As to argument 8, Morimoto maintains that BLNR's decision violates Article XI, § 1 of the Hawai'i Constitution and the Public Trust Doctrine. Article XI, § 1 pronounces that "the State and its political subdivisions shall conserve and protect Hawaii's natural beauty and all natural resources." Appellants assert that "the Public Trust Doctrine requires, at a minimum, recognition

27. Morimoto challenges BLNR's denial of all four motions, but he does not present an argument as to why the fourth motion should have been granted. In conclusion no. 7, BLNR ex-

that the State must affirmatively protect public resources, including natural resources." But as support, Morimoto only refers to (1) "contradictions of the factual conclusions in the record, including the finding of no substantial impact upon the Palila" and (2) "the court's failure to ensure that BLNR followed proper legal requirements, including rule-making."

Hence Appellants present no new arguments. In answer to Appellants' point one, there is substantial evidence supporting the BLNR's determination as set forth *supra.* Similarly, as to point two, the argument that "the court[ ] fail[ed] to ensure that BLNR followed proper legal requirements, including rule-making" has been addressed *supra.* Therefore, this claim does not implicate any error on the part of BLNR.

## XIII.

For the aforementioned reasons, we hold that the court correctly ruled that mitigation as provided in the EIS could be considered in the CDUP application. Also, there is substantial evidence to support the BLNR's conclusion that the project will not cause substantial adverse impact upon the natural resources of the project area.

Accordingly, the court's May 28, 2002 judgment is affirmed.

plained that his use of unnumbered textual paragraphs made it difficult for the hearing officer and BLNR to address his concern.