140 P.3d 985

Walter John KELLY, Charles Ross Flaherty, Jr., Patrick M. Cunningham, and Michele Constans Wilkins, Plaintiffs–Appellees/Cross–Appellants

and

Protect Keopuka Ohana, a Hawai'i non-profit corporation, Plaintiff–Appellee/Cross–Appellant

v.

1250 OCEANSIDE PARTNERS, a Hawai'i Limited Partnership, Defendant–Appellant/Cross–Appellant/Cross–Appellee

and

State of Hawai'i, Department of Health, and Chiyome Fukino,[1] in her official capacity as the director of the State of Hawai'i Department of Health, Defendants–Appellants/Cross–Appellees

and

Department of Land and Natural Resources, and Peter Young, in his official capacity as the Director of the State of Hawai'i Department of Land and Natural Resources, Defendants–Appellees

and

Land Use Commission, Defendant

and

County of Hawai'i, Christopher Yuen in his official capacity as the Planning Director for the County of Hawai'i, Dennis Lee, in his official capacity as the Chief Engineer, County of Hawaii, Defendants–Appellants/Appellees/Cross–Appellees

and

John Does 1–10, Jane Does 1–10, Doe Corporations, Partnerships, Governmental Units or Other Entities 2–20, Defendants (Nos. 26813 & 27864).

No. 26813.

Supreme Court of Hawai'i.

July 28, 2006.

---

**1.** Pursuant to Hawai'i Rules of Appellate Procedure Rule 43(c)(1), Chiyome Fukino and Peter Young, the current Directors of the Department of Health and of the Department of Land and Natural Resources, respectively, have been substituted for Bruce Anderson (Anderson) and Gil Agaran, the respective directors at the time this case was decided by the third circuit court.

Ivan M. Torigoe, Deputy Corporation Counsel, County of Hawaiʻi, on the briefs, for Defendants–Appellants/Cross–Appellees County of Hawaiʻi, Chrostopher Yuen, in his official capacity as the Planning Director for the County of Hawaiʻi, and Dennis Lee, in his official capacity as the Chief Engineer, County of Hawaiʻi.

Russell Suzuki and Adina Kobayashi Cunningham, Deputy Attorneys General, on the briefs, for Defendants–Appellees/Cross–Appellants State of Hawaiʻi Department of Health and Chiyome Fukino.

Alan T. Murakami and Moses K.N. Haia III (Native Hawaiian Legal Corporation), on the briefs, Honolulu, for Plaintiff–Appellee/Cross–Appellant Protect Keopuka ʻOhana.

David Kimo Frankel, on the briefs, for Amicus Curiae Sierra Club.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by ACOBA, J.

We hold in this consolidated appeal from the March 14, 2006 Fourth Amended Final Judgment (final judgment) of the third circuit court (the court),[2] that (1) Defendant–Appellant/Cross–Appellee County of Hawai'i (the County), by and through Defendant–Appellant/Cross–Appellee Christopher Yuen, in his official capacity as the Planning Director for the County of Hawai'i, and Defendant–Appellant/Cross–Appellee Dennis Lee (Lee), in his official capacity as Chief Engineer for the County of Hawai'i [collectively, the County Defendants], have an affirmative duty to protect the waters adjacent to the master planned project known as "Hokuli'a" (the Property) being developed by Defendant–Appellant/Cross–Appellant/Cross–Appellee 1250 Oceanside Partners (Oceanside) under the public trust doctrine,[3] (2) Plaintiffs–Appellees/Cross–Appellants Protect Keopuka Ohana (PKO),[4] Walter John Kelly, Charles Ross Flaherty, Jr., Patrick M. Cunningham, and Michelle Constans Wilkins (Kelly Plaintiffs) [collectively, Plaintiffs] failed to establish that the County breached its public trust duties with respect to water pollution that occurred in "Class AA" waters abutting the Property, (3) the court was correct in concluding that Defendant–Appellee–Cross–Appellant State of Hawai'i, Department of Health (DOH), by and through Dr. Chiyome Fukino, in her official capacity as the Director of Health, has a duty under the public trust doctrine enunciated in *In re Water Use Permit Applications,* 94 Hawai'i 97, 9 P.3d 409 (2000) [hereinafter, *Waiahole I* ], to protect the waters adjacent to the Property, but (4) PKO failed to sustain its burden of proving that DOH violated its public trust duties as alleged under Count II of the Fifth Amended Complaint (the Complaint) in relation to construction activities on the Property.

## I.

### A.

In the early 1990s, Oceanside planned a large-scale residential, recreational, and agricultural development of approximately 1,540 acres on the Property, which was situated between Kailua–Kona and Kealakekua on the island of Hawai'i. The proposed development included 730 residential lots, an 18–hole golf course, an 80–unit members' lodge, a golf clubhouse, beach lodge, and shoreline park.

The Property spans approximately 1.9 miles of coastline. The State of Hawai'i classifies the ocean waters off this coastline, Kealakekua Bay, as Class AA, which is the most protective classification for marine waters, and requires that the waters remain pristine, or in "wilderness" condition. Hawai'i Administrative Rules (HAR) §§ 11–54–

---

2. The Honorable Ronald Ibarra presided.

3. On or about February 12, 2002, and prior to this appeal, Plaintiffs–Appellees/Cross–Appellants Walter John Kelly, Charles Ross Flaherty, Jr., Patrick M. Cunningham and Michelle Constans Wilkins (Kelly Plaintiffs), Defendants–Appellants/Cross–Appellees County of Hawai'i (the County), Christopher Yuen, in his official capacity as the Planning Director for the County of Hawai'i, Dennis Lee, in his official capacity as Chief Engineer for the County of Hawai'i [collectively, the County Defendants] and Defendant–Appellee/Cross–Appellant State of Hawai'i, Department of Health (DOH) by and through Anderson, the then-Director of Health, entered into a Settlement, Release, and Defense and Indemnity Agreement wherein the Kelly Plaintiffs released and discharged DOH and the County from all liability as to Count II. On April 17, 2002, the court approved the settlement agreement. Count II proceeded to a bench trial with Plaintiff–Appellee/Cross–Appellant Protect Keo-

puka Ohana (PKO) as the remaining plaintiff. Accordingly, the remaining parties to the instant appeal are PKO, the County Defendants, and DOH.

As discussed *infra,* the claims against Defendant–Appellant/Cross–Appellant/Cross–Appellee 1250 Oceanside Partners (Oceanside) with regard to Count II of the Fifth Amended Complaint were dismissed with prejudice pursuant to a stipulation dated May 1, 2002.

4. PKO is a Hawai'i non-profit organization whose members include a coalition of Hawaiian cultural practitioners, environmental advocates, and lineal descendants of persons who are buried on the Hokuli'a property (the Property). PKO's stated purposes include educating and encouraging all persons to participate in "traditional Hawaiian cultural activities" and developing "community awareness and interests in the traditional and cultural heritage of the Hawaiian people."

3(c)(1) (2004),[5] 11–54–6(a)(2)(A) & (b)(2)(A) (2004).[6] Under Hawai'i County Code (HCC) chapter 10 (2005), entitled "Erosion and Sedimentation Control," Oceanside was required to obtain permits from the County for grading and grubbing for construction activities and for erosion control. In addition, Oceanside was required to obtain a permit from DOH to control water pollution pursuant to Hawai'i Revised Statutes (HRS) § 342D–6 (1993 & Supp.2005)[7] and HAR chapters 11–54 (2004)[8] and 11–55 (2005).[9]

After several public hearings and meetings commencing in 1993, Oceanside received county zoning approvals in 1994, 1996, and 1997, and various administrative approvals, including subdivision approvals. In April 1998, the County entered into a development agreement with Oceanside under HRS § 46–123 (1993),[10] ensuring Oceanside's right to proceed and requiring certain public benefits, including a five-mile highway and a 140–acre shoreline park. Oceanside began actual construction in January 1999 pursuant to these final discretionary approvals.

In July 1999, Oceanside applied to DOH for a general permit under the State's National Pollutant Discharge Elimination System (the NPDES) permit program.[11] The application, if approved, would permit Oceanside to perform erosion control measures to ensure that no discharge to the ocean occurred. The application required the submission of a Notice of Intent (NOI) to DOH for coverage under the construction general permit under HAR chapter 11–55. According to DOH, the NPDES is modeled on federal law, and authorized discharges of storm water associated with construction activity "that result in the disturbances of five acres or more of total land area." HAR Chapter 11–55. The NPDES also prohibits any pollution of Class AA waters. HAR § 11–54–4.

Among other requirements, the NPDES permit system directs that an applicant implement construction site best management practices, or "BMPs," "to ensure that storm water discharges associated with construction activities *will not cause or contribute to a violation of applicable state water quality standards.*" HAR chapter 11–55 (emphasis added). In its NOI, Oceanside did not propose to discharge storm water to Class AA waters. Rather, it proposed on-site runoff and erosion control measures that included erecting silt fences and discharging storm water into eight dry gulches on the Property,

**5.** Hawai'i Administrative Rules (HAR) § 11–54–3(c)(1) (2004) describes, in pertinent part, the State's objective with regard to Class AA waters in the following manner:

It is the objective of class AA waters that these waters remain in their *natural pristine state as nearly as possible with an absolute minimum of pollution or alteration of water quality from any human-caused source or actions. To the extent practicable, the wilderness character of these areas shall be protected.*
(Emphasis added.)

**6.** HAR § 11–54–6(a)(2)(A) & (b)(2)(A) (2004) list the specific areas of marine water requiring protection, including the open coastal Class AA waters in Kealakekua Bay, which is adjacent to the Property.

**7.** Hawai'i Revised Statutes (HRS) § 342D–6 (1993 & Supp.2005), entitled "Permits; procedures for," provides the statutory authority for the DOH to issue permits where potential water pollution could occur.

**8.** In general, HAR chapter 11–54 (2004), entitled "Water Quality Standards" deals with the classification of water and the maintenance of water quality within each classification.

**9.** HAR chapter 11–55 (2005), entitled "Water Pollution Control," provides the rules and regulations with regard to the abatement, prevention, and control of water pollution.

**10.** HRS § 46–123 (1993), entitled "General authorization," empowers the various counties to enter into a development agreement "with any person having a legal or equitable interest in real property, for the development of such property[,]" provided that certain procedures be promulgated beforehand in order to effectuate such agreement.

**11.** The United States Congress established and authorized the National Pollutant Discharge Elimination System (NPDES) regulatory and permitting system under the Clean Water Act, 33 U.S.C. §§ 1251–1386. *See Molokai Chamber of Comm. v. Kukui (Molokai), Inc.,* 891 F.Supp. 1389, 1392–94 (D.Haw.1995) (describing the federal and state NPDES system). In general, the federal government delegated to the State of Hawai'i the authority to implement the NPDES system, subject to federal statutes and regulations. *Id.*

to ensure that in the event of a storm, no water would be discharged into Class AA waters.

On October 11, 1999, after several comments by DOH, DOH approved a Notice of General Permit Coverage (the Permit) that allowed Oceanside to "discharge storm water associated with construction activity from the [Property] to the receiving waters of unnamed dry gulches ... at the discharge points' latitudes and longitudes specified in the site-specific plans for each phase of the construction." The Permit required that Oceanside comply with the NPDES and other administrative rules, and with "County approved sediment and erosion control plan(s) [hereinafter, ECP]." In particular, the Permit provided that Oceanside must comply with HAR § 11–54–4(a),[12] which prohibits the discharge of substances to Class AA waters. DOH claims in its opening brief that the Permit was the only permit issued by DOH to Oceanside.

Pursuant to HCC chapter 10, entitled "Erosion and Sedimentation Control," Oceanside was obligated to submit its ECP to the County for review. According to Joseph Vierra (Vierra), one of the principals of Belt Collins, Oceanside's contractor, the ECP "was designed to control erosion and to prevent soil and sediment from leaving [the Property] and entering the ocean" and was designed to withstand what he terms a "10-year storm." Vierra clarified that a "10-year storm" meant "a storm that drops 1.75 inches of precipitation in one hour." On September 10, 1999, the County reviewed and subsequently approved Oceanside's ECP.

### B.

On September 8 and 9, 2000, heavy rainstorms hit Kona. Oceanside's erosion control measures failed, in part because Oceanside did not complete all of its BMPs or the erosion control measures that it specified in its NOI. The storm caused flooding throughout the Property and runoff into the surrounding Class AA waters.

On September 12, 2000, a DOH inspector investigated reports of water pollution at the Property. On September 19, 2000, three DOH inspectors conducted a Compliance Evaluation Inspection at the Property. Oceanside represented that "additional erosion control measures are being implemented to prevent a recurrence of the discharge of sediment into the ocean from the [Property]." DOH continued to investigate the matter. County inspectors also visited the site and opined that Oceanside's erosion control measures failed because, in part, the County's ECP used by Oceanside was designed for a "10-year storm," but the September rainfall exceeded the County's ten-year storm standards. The report also noted that Oceanside did not complete all of its erosion control measures. Oceanside states that following the storm in September 2000, it revised its ECP incorporating new information from the September 9, 2000 storm and comments from the County and various State agencies.

### II.

### A.

On October 30, 2000, the Kelly Plaintiffs filed a complaint against DOH and Oceanside with the court. The Kelly Plaintiffs alleged that Oceanside violated the Permit, HRS chapter 342D, and HAR chapter 11–54 when its construction activities, coupled with the September storm, caused a significant sediment discharge into Class AA waters. Initially, the Kelly Plaintiffs sued DOH as "a

---

**12.** HAR § 11–54–4(a), entitled "Basic quality criteria applicable to all waters," provides in relevant part that "[a]ll waters shall be free of substances attributable to domestic, industrial, or other controllable sources of pollutants," including:

 ....

 (3) Substances in amounts sufficient to produce taste in water ... or *in amounts sufficient to produce objectionable color, turbidity,*

*or other conditions* in the receiving waters ..., [or]

 ....

 (6) *Soil particles resulting from erosion on land involved in earthwork,* such as the construction of public works; highways; subdivisions; recreational, commercial, or industrial developments; or the cultivation and management of agricultural lands.

(Emphases added.)

nominal defendant" and apparently alleged no claims against it.

On the same day, the Kelly Plaintiffs filed a motion for temporary restraining order (TRO) and preliminary injunction against Oceanside. They requested that the court enjoin Oceanside from importing dirt, fill, and other material into the project area and from excavating, dredging, or otherwise moving dirt that might cause further water pollution. DOH filed a response that set forth DOH's regulatory scheme and confirmed that it had sent inspectors to the Property. DOH stated that it was "still investigating the situation at the [Property]." Similarly, Oceanside filed a response to the Kelly Plaintiffs' motion.

On November 2, 2000, another storm, exceeding the 10-year storm level, caused further runoff from the Property into the coastal waters. On November 3, 2000, the court issued findings of fact, conclusions of law, and an order granting the Kelly Plaintiffs' motion for a TRO.

On November 14, 2000, the court commenced hearing on the Kelly Plaintiffs' motion for preliminary injunction. On that same day, PKO joined the Kelly Plaintiffs and filed the First Amended Complaint. The Plaintiffs continued to refer to DOH as a "nominal defendant" but brought additional claims against Oceanside and the County regarding native Hawaiian burial sites and remains.

On November 22, 2000, DOH filed a Notice and Finding of Violation and Order (NFVO) against Oceanside. In the NFVO, DOH alleged that in September and November 2000, Oceanside polluted Class AA waters in violation of the Permit and state law by failing to implement all of its BMPs. DOH claimed that Oceanside "lacked any permit, variance, or other written authorization from DOH to discharge or cause to allow dirt, soil, silt, sediment, and similar materials" to pollute Class AA waters. DOH ordered Oceanside to take immediate corrective action and to submit a water pollution control plan. DOH assessed penalties against Oceanside for up to $25,000 per day per violation. Approximately two weeks later, Oceanside requested a contested-case hearing before DOH pursuant to HRS § 91–9 (1993).[13]

On December 15, 2000, Plaintiffs, Oceanside, and DOH agreed to a stipulation converting the TRO to a preliminary injunction. On December 20, 2000, Plaintiffs, Oceanside, and DOH entered into a stipulation agreeing to the issuance of a permanent injunction against Oceanside. The stipulation prohibited Oceanside from "polluting, generating runoff, discharg[ing], [or] from causing sediment runoff into the Class AA waters off the [Property]." The stipulation also established a court-appointed water monitor to periodically sample and observe the Class AA waters for any violation of the injunction.[14] DOH continued to regulate Oceanside's activities and to coordinate with Oceanside additional erosion control measures designed to prevent future runoff.

### B.

On December 21, 2000, Plaintiffs filed their Second Amended Complaint. In Counts II and V of that complaint, Plaintiffs alleged that DOH and Bruce Anderson (Anderson), as the then-Director of Health, violated the public trust doctrine. According to Plaintiffs, DOH should have prevented Oceanside from violating water quality standards and that DOH failed, refused or neglected to take immediate remedial action against Oceanside. Plaintiffs sought declaratory and injunctive relief against DOH. On January 23, 2001, DOH filed its answer to the Second Amended Complaint.

On January 25, 2001, Oceanside filed its Motion to Strike and/or Dismiss Certain Claims in Plaintiff's Second Amended Complaint. On May 4, 2001, that motion was granted in part by the court in pertinent part as follows:

IT IS HEREBY ORDERED AND DECREED that ... [Oceanside's] Motion to

---

**13.** In general, HRS § 91–9 (1993), entitled "Contested cases; notice; hearing; records," provides parties an opportunity for a hearing before the appropriate state agency.

**14.** On January 9, 2001, the stipulation was amended to state that the court had final decision-making authority over when the claims in the stipulation had been settled.

Strike [or] Dismiss Certain Claims in Plaintiffs' Second Amended Complaint is granted in part as follows:

A. The claims and causes of action of the [Kelly Plaintiffs] set forth and stated in Count [ ] . . . II . . . of the Plaintiffs' Second Amended Complaint for Declaratory and Injunctive Relief filed December 21, 2000, *to the extent such [c]ount [ ] seek[s] injunctive relief or the revocation of any of the permits issued to [Oceanside] based upon the allegations set forth in such [c]ount[ ], [is] hereby dismissed with prejudice and [Kelly Plaintiffs] are not entitled to the requested injunctive relief or revocation of permits by reason thereof.*

B. The claims and causes of action of [PKO] set forth in Count [ ] II . . . of the Plaintiffs' Second Amended Complaint for Declaratory and Injunctive Relief filed herein on December 21, 2000, *to the extent such [c]ount [ ] seek[s] injunctive relief or the revocation of any permits issued to [Oceanside] based upon the allegations set forth in such [c]ount [ ], [is] hereby dismissed with prejudice and [PKO] is not entitled to the requested injunctive relief or revocation of permits by reason thereof.*

(Emphases added.)

On October 12, 2001, DOH moved for partial summary judgment on the grounds that Plaintiffs failed to state a claim for relief against DOH under Counts II and V. DOH averred that the parties and the court had already provided a remedy for the water pollution under the stipulated permanent injunction. DOH also argued that it had already issued the NFVO, and that an administrative determination was pending before DOH. In response, PKO argued that a genuine issue of material fact existed because, in part, "many questions touching squarely upon . . . DOH's trust duties beg to be answered[,]" including Oceanside's failure to implement BMPs and DOH's awareness of this failure. According to DOH in its opening brief, PKO "did not support these speculations with affidavits or other evidence." The Kelly Plaintiffs, on the other hand, argued that DOH did not meet its burden of proof. Similarly, DOH argues in its brief on appeal that the Kelly Plaintiffs did not attach any affidavits or other evidence in opposing DOH's motion. On November 21, 2001, the court denied DOH's motion regarding Counts II and V.

On October 15, 2001, Plaintiffs filed their Fourth Amended Complaint. Subsequently, on November 8, 2001, Plaintiffs filed their Fifth Amended Complaint (the Complaint). Count II of the Complaint, entitled "VIOLATION OF THE PUBLIC TRUST," states, in pertinent part, as follows:

99. *Pursuant to Article XI, §§ 1 and 6, the Hawaii State Constitution, [DOH], and its political subdivision, [the County], [are] obligated to manage the natural resources of the state, including the marine waters offshore of [the Property] in trust for the people of Hawaii.*

100. *The state legislature has implemented this provision in part by [Anderson] and the employees of . . . DOH to enforce measures designed to prevent and remedy pollution from point and non-point sources under the various powers conferred to them under HRS chapters 342D and 342E.*

101. Under HRS §§ 342–D9, D–11, D–20, D–30, D–31, D–32, D–33 and D–56, 342E–3, and E–4, these defendants have wide powers to hold violators of water quality standards liable for their actions, including the prosecution of independent higher priority civil suits to compel compliance, and the imposition of fees where necessary to enforce measures to prevent future harm.

102. Under HRS § 342D–17, all state and county health authorities and police officers must enforce HRS chapter 342D and the rules and orders of . . . DOH.

103. *Under their trust duty, [DOH] and [the County] employees in charge of protecting the coastal waters are required to assure the integrity of these Class AA waters and act as prudent trustees would to assure that it is adequately protected from violations of the applicable water quality standards.*

104. Under [HCC] Article 2, § 10–20, the maximum area of land that may be cleared for grading or grubbing is twenty acres, unless otherwise allowed by the

County Chief Engineer. The area of land that may be cleared may be increased or reduced by the chief engineer to control pollution and minimize storm damage. Additional area cannot be cleared until measures to prevent dust or erosion problems in the area already graded or grubbed have been completed.

105. *By allowing [Oceanside] to grade more than 20 acres in an area susceptible to erosion due to the topography, especially after the September 8–9, 2000 rainfall event that led to major erosion into Class AA waters, [Lee's] predecessor, Robert Yanabu, abused his discretion, ignored his duties, and violated the prohibition against allowing grading until reasonable erosion control measures had been completed.*

106. *By failing, refusing, or neglecting to take immediate remedial action to order the cessation of the practices that led to these violations after two instances of causing major soil erosion directly into coastal waters off the project site, [the Defendants] breached their public trust duty to [the Plaintiffs] and other members of the general public who use, or would use, and enjoy the marine waters and other natural resources associated with it.*

107. *By failing to prevent [Oceanside] from violating water quality standards, [the Defendants] violated their regulations and statutes governing the protection of Class AA waters.*

(Emphases added.) As to Count II, Plaintiffs requested that the court issue (1) a judgment declaring that DOH "failed to apply reasonable standards, or to seek available remedies under its governing statutes, to prevent violations of state water quality standards under [the Permit] it issued to meet it's [sic] public trust duties" and (2) a judgment declaring that the County "violated the [HCC] by allowing ... Oceanside to grade more than 20 acres of its property at one time in constructing its project, in the absence of completed erosion control measures reasonably calculated to stop erosion into Class AA waters."

In addition, in a section of the Complaint entitled "Prayer for Relief," Plaintiffs requested, *inter alia*, that the court (a) "[i]ssue declaratory judgments [or] orders declaring and adjudging the violations of laws [mentioned in the Complaint,]" (b) "[i]ssue a permanent injunction against the appropriate Defendants named herein from violating the [laws specified in the Complaint] and enjoining the illegal conduct previously specified," and (c) "[g]rant such other and further appropriate relief to Plaintiffs for the protection of the public and the public trust that th[e c]ourt deems proper and just."

On May 1, 2002, the court granted a Stipulation to Dismiss Resolved Claims, Causes of Action, and Allegations and Order (May 1, 2002 order) entered into by the parties. In relevant part, the May 1, 2002 order stated as follows:

IT IS HEREBY STIPULATED ... that certain claims, causes of action [or] allegations set forth in the [Complaint] ... filed herein on November 8, 2001, and any other further amendments, modification or corrections to said claim[ ], causes of action [or] allegations, are hereby dismissed as follows:

. . . .

2. The claims and causes of action of PKO and Kelly as set forth and stated in Count[ ] II (Violation of the Public Trust) ... of the Second Amended Complaint for Declaratory and Injunctive Relief filed herein on December 21, 2000, and as set forth and restated in Count[ ] II ... of the [Complaint], *to the extent that such count[ ] seek[s] injunctive relief or the revocation of any of the permits issued to Oceanside based upon the allegations set forth in such count[ ], [is] dismissed with prejudice as to all defendants and said Plaintiffs are not entitled to the requested injunctive relief or revocation of permits by reason thereof.*

(Emphasis added.)

C.

The court divided the trial on all counts into three phases. On July 1, 2002, the court ruled that following the trial on Counts II and V, a "remedies trial" would be held, if necessary, "for remedies that may be afford-

ed the prevailing parties on Counts II, V, VI, VII, and X of the Complaint." Trial for Counts II and V commenced sometime in July 2002. During the bench trial on Counts II and V, three witnesses testified regarding Oceanside's pollution of Class AA waters. Two testified on behalf of PKO and the third on behalf of Oceanside. The first PKO witness, Wayne Leslie (Leslie), a member of PKO and a commercial fisherman, testified that he practiced subsistence fishing on the waters adjacent to the Property. He witnessed storm water runoff into the ocean after the September and November 2000 storms. According to Leslie, the pollution caused by the runoffs affected his catch of fish. Leslie stated that he met with a DOH employee who he believed would help Oceanside implement its ECP. Leslie also expressed his concern to DOH's attorney that the erosion control map be overlaid with the burial sites map. Leslie was aware of DOH's citation of Oceanside. However, he stated that DOH failed to respond to PKO's request to participate in the contested case hearing regarding the NFVO.

The second PKO witness, Jim Medeiros, Sr. (Medeiros), president of PKO, testified that he fished from the shore of the Property. Medeiros acknowledged knowing about the NFVO and also spoke with DOH's attorney regarding the erosion control measures.

Oceanside's witness, William Paris (Paris), testified that he saw water runoff around September and November 2000, which heavily polluted the Class AA waters. Paris related that the water cleared up "in a matter of a few months," and that the manini [15] and 'a'ama [16] returned. He related that approximately three months after the last runoff, he went diving, and "the fish were plentiful in the bay ... and the bottom seemed very clear."

On August 14, 2002, after the close of PKO's case, DOH moved for judgment on partial findings and dismissal of Counts II and V. DOH contended that PKO failed to present sufficient evidence to prove Counts II and V. The court heard the motion on August 14, 2002. On September 11, 2002, the final day of trial, the court denied DOH's motion.

On September 16, 2002, the court conducted a Hawai'i Rules of Civil Procedure (HRCP) Rule 16 [17] Status Conference (status conference) to which Plaintiffs, Oceanside, DOH, and the County participated. On October 17, 2002, following the status conference, the court ordered, *inter alia*, that (1) the parties submit proposed findings of fact and conclusions of law on Counts II, V, and VI, (2) evidence admitted during trial for Count X and the burials trial, which included Count II, "shall be deemed to be a part of

---

**15.** "Manini" is defined as a "[v]ery common reef surgeonfish (Acanthurus tristegus), also called convict tang, in the adult stage." M.K. Pukui & S.H. Elbert, *Hawaiian Dictionary*, at 238 (rev. ed.1986).

**16.** " 'A'ama" is defined as "[a] large, black, edible crab that runs over shore rocks." *Id.* at 3.

**17.** Hawai'i Rules of Civil Procedure Rule 16 (2002), entitled "Pre-trial conferences; scheduling; management," provided, in pertinent part, as follows:

(a) **Pretrial conferences; objectives.** In any action, the court may in its discretion direct lead counsel or other attorneys for the parties and any unrepresented parties to appear before it for a conference or conferences before trial for such purposes as

(1) expediting the disposition of the action;

(2) establishing early and continuing control so that the case will not be protracted because of lack of management;

. . . .

(c) **Subjects for consideration at pretrial conferences.** At any conference under this rule consideration may be given, and the court may take appropriate action, with respect to

. . . .

(3) the possibility of obtaining admissions of fact and of documents which will avoid unnecessary proof, stipulations regarding the authenticity of documents, and advance rulings from the court on the admissibility of evidence;

. . . .

(16) such other matters as may facilitate the just, speedy, and inexpensive disposition of the action.

. . . .

(e) **Pretrial orders.** After any conference held pursuant to this rule, an order shall be entered reciting the action taken. *This order shall control the subsequent course of the action unless modified by a subsequent order.* The order following a final pretrial conference shall be modified only to prevent manifest injustice.

(Emphasis added.)

the record *for the remedies trial* [ [18]] and need not be readmitted or reintroduced." (Emphasis added.) As to part (2), the court clarified that "[t]his does not include any evidence admitted during any of the preliminary injunction, temporary restraining order or contempt proceedings."

On October 21, 2002, the court entered its findings of fact (findings), conclusions of law (conclusions), and order with respect to count II and V of the Complaint. The pertinent findings and conclusions as to Count II are set forth as follows:

### FINDINGS OF FACT

. . . .

14. [The Property] is being developed by [Oceanside], a Hawaii limited partnership, on approximately 1,550 areas [sic] of undeveloped land which extends mauka from the ocean almost to Mamalahoa Highway and straddles the boundaries of North and South Kona.

15. The ocean waters bordering the [Property] are classified as Class AA open coastal waters pursuant to Title 11, Chapter 54, amended Administrative Rules for Water Quality Standards, the highest designation for water quality.

16. *[The County] adopted ordinances and issued use permits, grading and grubbing permits for the [Property].*

17. *The [DOH] approved plans and issued permits which allowed ground alteration activities for the [Property].*

18. *None of the ordinances, permits or plans issued by any defendant addressed the effect of ground alteration activity or storage of construction materials on the coastal waters off the [Property].*

19. *The approvals do not contain affirmative requirements of an assessment addressing potential run-off pollution into the coastal waters; nor is there any evidence of [the DOH or the County] requiring an assessment.*

20. *The DOH permit, Form C entitled "Notice of Intent (NOI) for Discharges" of storm waters associated with construction*

*activity prohibited [Oceanside] to discharge [sic] any sediments or topsoil brought to the [Property] into the offshore Class AA waters. This permit is issued under [HRS c]hapter 342D.*

21. *[Oceanside,] pursuant to [DOH] and [County's] approvals and authorizations[,] conducted ground altering activities including grading the land and grubbing the vegetation on the [Property].*

22. *[Oceanside,] through its contractors [or] employees hauled tons of dirt and fill from areas other than the [Property] onto the [Property]. This imported soil, dirt [or] fill was and is being stored in huge mounds on the [Property] with the approval [or] authorizations of [DOH] or [the County].*

23. [Oceanside] received approval for the use of herbicides and did use herbicides without any prior assessment ordered by [the County] of the herbicides' effect on the coastal waters.

24. On September 8 and 9, 2000, rainfall triggered massive runoff of sediment, dirt, soil, and debris into the coastal waters.

25. On November 2, 2000, rainfall triggered another massive runoff of sediment, dirt, soil, and debris into the coastal waters.

26. The runoff caused floating trash, dirt, light stones and brown mass in the coastal waters. There was a lot of pollution in the waters for three weeks. The current took the brown mass out to sea.

27. *There is no evidence as to any action taken by [DOH] and [the County] after this runoff other than a notice of violation issued by DOH.*

28. [Leslie] is a commercial and subsistence fisherman, as were several of his family members going back to his great-grandfather. . . . He has visited the [Property] since he was ten to the present; he is now 32.

. . . .

38. *On two occasions, once in September and once in November 2000, Leslie saw dirt and silt covering the shoreline*

---

**18.** The parties do not elucidate on what ensued during the remedies trial.

*face, runoff flowing into the ocean and muddy water in the ocean.*

39. *On those occasions he saw mountains of sand, cinder, and soil about 150–200 yards from shore on the [Property], and the shore had been affected by the runoff.*

. . . .

48. *After the pollution of the coastal waters off the [Property], there were fewer fish (opelu, reef fish), less offshore marine bottom life of certain types (crabs, limu, kohu, limu paheehee, haʻukeʻuke (sea urchins)).*

49. *DOH filed a notice of violation regarding the September and November 2000 runoffs and Wayne Leslie wrote to DOH requesting a contested case hearing. Leslie did not hear anything from DOH.*

. . . .

66. *The [c]ourt finds and concludes that the ground altering activities on [the Property] contributed to the water runoff from the [Property] into coastal waters.*

. . . .

CONCLUSIONS OF LAW

. . . .

6. For the benefit of present and future generations, *the [S]tate and its political subdivisions shall conserve and protect Hawaii's natural beauty and all natural resources, including water and shall promote the development and utilization of these resources in a manner consistent with their conservation and in furtherance of self-sufficiency of the state. All public natural resources are held in trust for the benefit of the people.* Article XI, Section 1, Hawaii State Constitution.

7. *The [S]tate has an obligation to protect the use of Hawaii's water resources for the benefit of the people.* Article XI, Section 7 Hawaii State Constitution, [*Waiahole I,*] 94 Hawaiʻi [a]t 131[, 9 P.3d at 443].

8. *The public trust is a state constitutional doctrine as other state constitutional guarantees [sic], the ultimate authority to interpret and defend the public trust in*

*Hawaii vests with the courts of this state.* (*Id.*)

9. "The duties imposed upon the state are the duties of a trustee and not simply the duties of a good business manager." [citation omitted] "Just as private trustees are judicially accountable to their beneficiaries of the res, so the legislative and executive branches are judicially accountable for the dispositions of the public trust. The beneficiaries of the public trust are not just present generations but those who come. The check and balance of judicial review provides a level of protection against improvident dissipation of an irreparable res." *Arizona Cent. for Law in Pub. Interest v. Hassell,* 172 Ariz. 356, 837 P.2d 158, 168–69 (Ct.App.1991), *review dismissed,* 172 Ariz. 356, 837 P.2d 158 (1991).

10. The courts will not supplant its judgment on that of the legislature or agency. However, courts will take a "close look" at the action to determine if it complies with the public trust doctrine and it will not act merely as a rubber stamp for agency on [sic] legislative action. (*Id.*)

11. *[HRS c]hapter 342D dealing with water pollution of coastal waters does not override the public trust doctrine or render it superfluous.* See [*Waiahole I*], 94 Hawaiʻi at 133[, 9 P.3d at 445,] *where the state water code within the state did not supplant the public trust doctrine.*

12. *Under [HRS] chapter 342D–4 the Director of Health is to prevent, control, and abate water pollution in the state. This section authorizes the Director of Health to adopt [c]hapter 91 rules and is [sic] in addition to any other power or duty prescribed by law. Whatever erosion control measures implemented by Oceanside pursuant to [DOH] or [County] permits or approvals stem from HRS 342D and is [sic] insufficient to meet the mandate of the public trust doctrine.*

13. [DOH] and [the County] have *an affirmative duty to take the public trust into account before, during and after the approval and authorization of ground alteration activities, storage of soil, silt, and use of herbicides on the [Property] even*

*prior to being decided by the Hawaii Supreme Court.*

14. *None of the permits, approvals or authorization documents issued by the [DOH] and [the County] required a prior assessment on the effect of [Oceanside's] permitted activities on pristine waters off [the Property]. The pollution of the adjacent coastal waters were caused by [Oceanside's] ground altering activities allowed and approved by the [DOH] and [the County]. The [DOH] and [the County] did not act prudently by not affirmatively requiring an assessment prior to permit approvals or an assessment after the runoffs.*

15. In 2000, the Hawaii Supreme Court stated in *Ka Pa'akai [O Ka'ina v. Land Use Comm'n*, 94 Hawai'i 31, 47, 7 P.3d 1068 (2000) (hereinafter, *Ka Pa'akai* ),] *in order to protect customary and traditional native Hawaiian rights, the State, at a minimum was required to make specific findings and conclusions as to the following: (1) the identity and scope of valued cultural, historical, or natural resources in the area, including the extent to which traditional and customary native Hawaiian rights are exercised in the area; (2) the extent to which those resources—including traditional and customary native Hawaiian rights will be affected or impaired by the proposed action; and (3) the feasible action to be taken by the state to reasonably protect native Hawaiian rights if they are found to exist. ...*

16. *Runoffs from the [Property] into the adjacent pristine coastal waters polluted the waters.*

17. *This pollution interfered with members of the public's use and enjoyment of the pristine waters.*

18. *This pollution affected the marine life immediately after the runoffs.*

19. *Plaintiffs have proven by a preponderance of the evidence that the [DOH] and [the County] violated their duties as public trustees by not protecting the adjacent coastal waters from pollution.*

(Emphases added.)

The court then entered the following order:

ORDER

1. As to Count II, *[DOH] and [the County] breached their public trust duty to Plaintiffs and other members of the general public who use or would use the pristine waters off the [Property].*

. . . .

3. The court reserves jurisdiction over attorney's fees and costs *and for any enforcement action.*

. . . .

IT IS HEREBY ORDERED that before permits or approvals are issued by [DOH] and [the County], the [DOH] make specific findings and conclusions: *(1) as to the value of the pristine waters and natural resources within the pristine waters off the [Property]; (2) as to the extent to which the water and natural resources will be affected or impaired by [Oceanside's] ground alteration, storage of materials and other activities and subject to regulation by the [DOH] or County; and (3) as to the feasible action to be taken by the [DOH] to reasonably protect those natural resources.*

IT IS FURTHER ORDERED that the [DOH] now make specific findings as to [Oceanside's] activity's impact on the offshore coastal waters *which was previously permitted* by the authorizations [or] approvals on the [Property] and that DOH take feasible action to protect the resources.

(Emphases added.) In its opening brief, DOH states that, in compliance with the court's order, it conducted a natural resources damages analysis.

On August 8, 2003, the court amended its order to correct the erroneous inclusion of the Department of Land and Natural Resources, which had earlier been dismissed from the case prior to trial. Following several amendments, the court entered its Third Amended Final Judgment. On September 9, 2004, the County filed its notice of appeal from that judgment and on September 22, 2004, DOH filed its notice of cross-appeal

from the Second and Third Amended Final Judgments.

### D.

On August 27, 2004, while the instant appeal was pending, PKO, the Kelly Plaintiffs, and Defendants filed a Joint Rule 60(b) Motion to Partially Vacate Third Amended Final Judgment (rule 60(b) motion) before the court pursuant to HRCP Rule 60.[19] On November 13, 2005, The Sierra Club filed its amicus curiae brief addressing, *inter alia*, the remaining Count II issues before this court. On March 3, 2006, Oceanside filed its Motion for Remand and Stay of Proceedings before this court in order for the court to formally hear the parties' rule 60(b) motion. On March 7, 2006, Oceanside's motion was granted by this court.

On March 14, 2006, the court found that the parties had entered into a settlement agreement with respect to claims against the Defendants other than those in Count II, and granted the parties' joint rule 60(b) motion. Accordingly, the court entered its Fourth Amended Final Judgment (the final judgment). As to Count II of the Complaint, the court reiterated its October 21, 2002 order by ruling in the following manner:

2. Count II: On Count II of the Complaint, alleging violation of the Public Trust, judgment is hereby entered in favor of [PKO] and against Defendants[.]

As to [DOH] and [the County], IT IS HEREBY ORDERED that:

[B]efore permits or approvals are issued by [the Defendants], [DOH must] make specific findings and conclusions: (1) as to the value of the pristine waters and natural resources within the pristine waters off the [Property]; (2) as to the extent to which those resources will be affected or impaired by [Oceanside's] ground alteration, storage of materials and other activities and subject to regulation by [DOH or the County]; and (3) as to the feasible action to be taken by [DOH] to reasonably protect those natural resources.

IT IS FURTHER ORDERED that [DOH must] now make specific findings as to [Oceanside's] activity's impact on the offshore coastal waters which was previously permitted by the authorizations [or] approvals on the [Property] and that DOH take feasible action to protect the resources.

Count II is hereby dismissed with prejudice against [Oceanside].

All other claims by Kelly Plaintiffs in Count II are dismissed with prejudice as to [DOH], and [the County], pursuant to settlement of these parties.

On April 5, 2006 and April 11, 2006, the County and DOH, respectively, filed their notices of appeal of the final judgment "as a protective measure to confirm their ability to maintain the [r]emaining Count II[a]ppeals." The County and DOH were assigned appeal No. 27864.

On May 9, 2006, the parties filed a Stipulation for Partial Dismissal of Appeal and Order indicating that the remaining issues in this case involve DOH and County's respective appeals of the court's ruling "relating to coastal water" under Count II of the Complaint, and that no other claims remain in the instant appeal. On May 11, 2006, this court approved the parties' May 9, 2006 stipulation.

On June 22, 2006, PKO, the County, and DOH filed a "Memorandum of Stipulation to Consolidate Appeals in S.C. Nos. 26813 [ (the instant appeal) ] and 27864 and Submit Case Briefs Filed in S.C. No. 26813." On June 26, 2006, the consolidation of Nos. 26813 and No. 27864 was approved. It was ordered that only briefs already filed by the parties in No. 26813, as designated by the parties, would be

---

19. Hawai'i Rules of Civil Procedure (HRCP) Rule 60(b) (2006) provides that the trial court "may relieve a party or a party's legal representative ... from a final judgment, order, or proceeding for the following reasons: ... (5) ... [I]t is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judg-

ment." HRCP Rule 60(b) is similar to Federal Rules of Civil Procedure Rule 60(b) which has been observed to permit "the vacation of a judgment on the grounds that the case has been settled so that it would not be equitable to have it remain in effect[.]" 11 C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure: Civil* § 2863, at 349 (2d ed.1995)

considered in deciding the remaining Count II issues on appeal.[20]

### III.

On appeal, the County argues that the "court erred in ruling that the [County] violated a public trust duty to protect the coastal waters [off the Property] inasmuch as" (1) "the State of Hawai'i, not the County, has public trust obligations under the . . . public trust doctrine," and (2) Plaintiffs "failed to carry their burden of proof regarding the alleged runoff pollution." Accordingly, the County requests that this court reverse the court's final judgment.

In response to the County's arguments, PKO maintains in its answering brief that (1) the County, "as a political subdivision of the State of Hawai'i, and pursuant to its official duties . . . has public trust duties under the . . . public trust doctrine[,]" and (2) the "court's holding that the County breached its public trust duties is supported by sufficient evidence in the record." In its reply brief, the County (1) argues that PKO provides no authority for imposing public trust duties on the County, and (2) reiterates its argument that PKO failed to meet its burden of proof on the flood issues.

In its appeal, DOH contends that (1) the court "misapplied the public trust doctrine" as enunciated by this court in *Waiahole I* and *In re Wai'ola O Moloka'i, Inc.*, 103 Hawai'i 401, 83 P.3d 664 (2004) [hereinafter *Wai'ola* ], (2) "insufficient evidence supported the court's conclusions that DOH violated the public trust doctrine[,]" and (3) the court misapplied the doctrine set forth in this court's opinion in *Ka Pa'akai* regarding the State's duty to protect traditional and customary native Hawaiian rights. DOH now maintains that the court's declarations of law with respect to Count II should be reversed, and that the court should enter judgment in its favor.

PKO counters in its answering brief to DOH's opening brief that (1) the court's "application of the public trust doctrine in this

case was proper[,]" (2) "sufficient evidence exists for the [court's] breach of public trust ruling[,]" (3) the court also properly applied *Ka Pa'akai*, and (4) DOH's appeal regarding the court's application of *Ka Pa'akai* is moot inasmuch as DOH "accepted the [court's] application and interpretation [of that case] when it complied with the court's ruling and performed the injunctive relief ordered."

In its reply brief, DOH maintains that (1) its appeal regarding the application of *Ka Pa'akai* is not moot inasmuch as the appeal "rests on existing facts or rights and involves an ongoing controversy," and (2) the court's declarations of law in this respect "fall within two well-recognized exceptions to the mootness doctrine," namely the public interest exception and the capable-of-repetition-yet-evading-review exception. In addition, DOH argues that (3) PKO failed to carry its burden of proof in showing that DOH abdicated its public trust duties, and (4) DOH satisfied its duties under the public trust doctrine.

### IV.

The court's findings of fact are reviewed under the "clearly erroneous standard." *Kienker v. Bauer*, 110 Hawai'i 97, 105, 129 P.3d 1125, 1133 (2006) (citing *Child Support Enforcement Agency v. Roe*, 96 Hawai'i 1, 11, 25 P.3d 60, 70 (2001)). A finding of fact is "clearly erroneous when (1) the record lacks substantial evidence to support the finding or determination, or (2) despite substantial evidence to support the finding or determination, the appellate court is left with the definite and firm conviction that a mistake has been made." *Id.* Substantial evidence is "credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." *Morimoto v. Bd. of Land & Natural Resources*, 107 Hawai'i 296, 302, 113 P.3d 172, 178 (2005) (quoting *Lanai Co. v. Land Use Comm'n*, 105 Hawai'i 296, 308–09, 97 P.3d 372, 384–85 (2004)). "A trial court's conclusions of law are reviewed de novo un-

---

**20.** In light of the court's May 4, 2001 and May 1, 2002 orders, the claims and causes of action of both the Kelly Plaintiffs and PKO against all defendants were dismissed with prejudice "to the extent such counts seeks injunctive relief" and Plaintiffs were "not entitled to the requested injunctive relief."

der the right or wrong standard." *In re Estate of Kam*, 110 Hawai'i 8, 18, 129 P.3d 511, 521 (2006) (quoting *Child Support*, 96 Hawai'i at 11, 25 P.3d at 70).

The court's interpretations of the public trust doctrine and the doctrine set forth in *Ka Pa'akai* implicate questions of constitutional law, which this court answers "by exercising [its] own independent judgment based on the facts of the case, and, thus, questions of constitutional law are reviewed on appeal under the right [or] wrong standard." *Freitas v. Admin. Dir. of Courts*, 108 Hawai'i 31, 37, 116 P.3d 673, 679 (2005) (internal quotation marks omitted) (quoting *State v. Jenkins*, 93 Hawai'i 87, 100, 997 P.2d 13, 26 (2000)). "Under the right [or] wrong standard, this court examines the facts and answers the question without being required to give any weight to the trial court's answer to it." *Leslie v. Estate of Tavares*, 91 Hawai'i 394, 399, 984 P.2d 1220, 1225 (1999) (internal brackets and quotation marks omitted).

## V.

### A.

The public trust doctrine was adopted by this court in *King v. Oahu Ry. & Land Co.*, 11 Haw. 717 (Hawai'i Rep.1899). In that case, the reasoning of the United States Supreme Court in *Illinois Cent. R.R. v. Illinois*, 146 U.S. 387, 13 S.Ct. 110, 36 L.Ed. 1018 (1892), was adopted, holding that title to land below the high water mark was

different in character from that which the state holds in lands intended for sale.... *It is a title held in trust for the people of the state that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein freed from the obstruction or interference of private parties.... The control of the state for the purposes of the trust can never be lost, except as to such parcels as are used in promoting the interests of the public therein,* or can be disposed of without any substantial impairment of the public interest in the lands and waters remaining.... *The state can no more abdicate its trust over property in which the whole people are interested, like navigable waters and soils under them, so as to leave them entirely under the use and control of private parties, except in the instance of parcels mentioned for the improvement of the navigation and use of the waters, or when parcels can be disposed of without impairment of the public interest in what remains, than it can abdicate its police powers in the administration of government and the preservation of the peace. In the administration of government the use of such powers may for a limited period be delegated to a municipality or other body, but there always remains with the state the right to revoke those powers and exercise them in a more direct manner, and one more conformable to its wishes. So with trusts connected with public property, or property of a special character, like lands under navigable waters, they cannot be placed entirely beyond the direction and control of the state.*

*King*, 11 Haw. at 723–24 (emphases added). Simply stated, this court concluded that "[t]he people of Hawaii hold the absolute rights to all its navigable waters and the soils under them for their own common use," *id.* at 725, 1899 WL 1502 (citation omitted), and that "[t]he lands under the navigable waters in and around the territory of the Hawaiian Government are held in trust for the public uses of navigation," *id.* (citation omitted).

In *Waiahole I*, this court recognized that later decisions of this court confirmed the acceptance of the public trust doctrine in this jurisdiction. 94 Hawai'i at 128, 9 P.3d at 440 (citing *County of Hawai'i v. Sotomura*, 55 Haw. 176, 183–84, 517 P.2d 57, 63 (1973) (holding that "[l]and below the high water mark ... is a natural resource owned by the state subject to, but in some sense in trust for, the enjoyment of certain public rights"); *In re Sanborn*, 57 Haw. 585, 593–94, 562 P.2d 771, 776 (1977) (holding ineffective under the public trust doctrine the registration of lands below the high water mark); *State v. Zimring*, 58 Haw. 106, 121, 566 P.2d 725, 735 (1977) (holding that lava extensions "vest when created in the people of Hawaii, held in public trust by the government for the benefit, use and enjoyment of all the people")).

In this court's decision in *McBryde Sugar Co. v. Robinson*, 54 Haw. 174, 187, 504 P.2d 1330, 1339, *aff'd on reh'g*, 55 Haw. 260, 517 P.2d 26 (1973), *appeal dismissed and cert. denied*, 417 U.S. 962, 94 S.Ct. 3164, 41 L.Ed.2d 1135 (1974), it was observed that, at the time of the introduction of fee simple ownership in land, the king reserved ownership in all surface waters. With respect to the duties imposed upon a public trust, it was explained in *Robinson v. Ariyoshi*, 65 Haw. 641, 674, 658 P.2d 287, 310 (1982), that such a duty was owed to "future generations" to assure reasonable and beneficial uses of resources:

> [B]y this reservation, a public trust was imposed upon all the waters of the kingdom. That is, we find the public interest in the waters of the kingdom was understood to necessitate *a retention of authority and the imposition of a concomitant duty to maintain the purity and flow of our waters for future generations and to assure that the waters of our land are put to reasonable and beneficial uses.* This is not ownership in the corporeal sense where the State may do with the property as it pleases; rather, we comprehend the nature of the State's ownership as *a retention of such authority to assure the continued existence and beneficial application of the resource for the common good.*

(Emphases added.) Hence, under *Robinson*, "[t]he State unquestionably has the power to accomplish much of this through its police powers." *Id.* at 674 n. 31, 658 P.2d at 310, n. 31. However, "the king's reservation of his sovereign prerogatives respecting water constituted much more than a restatement of police powers . . . [and] retained on behalf of the people an interest in the waters of the kingdom which the State has an obligation to enforce and which necessarily limited the creation of certain private interests in waters." *Id.*

As explained in *Waiahole I*, several provisions were added to the Hawai'i Constitution relating to the State's natural resources, including water. 94 Hawai'i at 129–30, 9 P.3d at 441–42. Article XI, section 1 of the Hawai'i Constitution, entitled "Conservation and Development of Resources," provides:

> For the benefit of present and future generations, *the State and its political subdivisions shall conserve and protect Hawaii's natural beauty and all natural resources,* including *land, water,* air, minerals and energy sources, and shall *promote the development and utilization of these resources in a manner consistent with their conservation and in furtherance of the self-sufficiency of the State. All public natural resources are held in trust by the State for the benefit of the people.*

(Emphases added.) *Waiahole I* observed that "the people of this [S]tate have elevated the public trust doctrine to the level of a constitutional mandate." 94 Hawai'i at 131, 9 P.3d at 443. As such, it was held that "article XI, section 1 . . . adopt[s] the public trust doctrine as a fundamental principle of constitutional law in Hawai'i." *Id.* at 131–32, 9 P.3d at 443–444.

Furthermore, the *Waiahole I* court ruled that "the public trust doctrine applies to all water resources without exception or distinction." *Id.* at 133, 9 P.3d at 445. It is noted that in response to a query of whether the amendments to Article XI encompassed "the ocean as a source of water," the proponents of the amendment understood "water resources" as "includ[ing] ground water, surface water, and all other water." Debates in Committee of the Whole on Conservation, Control and Development of Resources [hereinafter, Debates], in 2 Proceedings of the Constitutional Convention of Hawaii of 1978 [hereinafter, Proceedings], at 861 (1980) (statement by Delegate Fukunaga).

### B.

■ With respect to the powers and duties of the State in relation to water resources, this court, as stated before, described the public trust as "the authority and duty 'to maintain the purity and flow of our waters for future generations and to assure that the waters of our land are put to reasonable and beneficial uses.'" *Waiahole I*, 94 Hawai'i at 138, 9 P.3d at 450 (quoting *Robinson*, 65 Haw. at 674, 658 P.2d at 310). Such duty is reflected in article XI, section 1 of the Hawai'i Constitution which requires the State

and its political subdivisions to "protect" and "promote" the State's water resources.

■ The duty to protect includes the duty to "ensure the continued availability and existence of its water resources for present and future generations." *Id.* at 139, 9 P.3d at 451. Likewise, the duty to promote incorporates the duty to promote "the development and utilization of [water] resources *in a manner consistent with their conservation* and in furtherance of the self-sufficiency of the State." Haw. Const. Art. XI, sec. 1 (emphasis added). As was recognized by the majority of this court in *Wai'ola*, "maximizing the water resource's social and economic benefits includes the protection of the resource in its natural state." 103 Hawai'i at 430, 83 P.3d at 693.

### VI.

#### A.

We first turn to the County's argument (1) that "the State of Hawai'i, not the County, has public trust obligations under the . . . public trust doctrine." According to the County, the State, and not the County, "owns the coastal waters, lands beneath them, and natural resources within them." Therefore, the County maintains that it should not be held liable for any breach of public trust responsibilities because these responsibilities "arise from the sovereign's *ownership* of public lands". (Emphasis in original.)

■ In support of this assertion, the County makes four arguments. First, it relies on *Waiahole I*, which stated that "[l]and below the high water mark . . . is a natural resource owned by the [S]tate subject to, but in some sense in trust for, the enjoyment of certain public rights." 94 Hawai'i at 128, 9

P.3d at 440 (quoting *Sotomura*, 55 Haw. at 183–84, 517 P.2d at 63). Second, the County asserts that "under the Hawai'i Constitution, '[a]ll public natural resources are held in trust by the State for the benefit of the people[,]'" (quoting Haw. Const. Art. XI, sec. 1), and that "the [S]tate has been given the power to 'manage and control the marine, seabed, and other resources within state boundaries[,]'" Haw. Const. Art. XI, sec. 6. Third, the County points out that "the legislature is given the responsibility to designate the governmental bodies with the authority to manage [S]tate-owned public resources" under article XI, section 2, and that the legislature has done so by vesting authority in the Board of Land and Natural Resources "with the authority to 'manage, administer, and exercise control' over all public lands, ocean waters, and coastal areas" under HRS § 171–3 (Supp.2005).[21] Fourth, although the State may transfer public lands to the counties for a public use or purpose, under HRS § 171–11 (1993),[22] it has not done so with respect to the waters or submerged lands adjacent to the Property. The County maintains that "[u]nless and until the [S]tate transfers all or some of its interest in those coastal waters to the [County], the [C]ounty has no attendant obligations under the public trust doctrine." The plain language of the relevant provisions of the Hawai'i Constitution does not support the County's assertions.

#### B.

■ In construing the provisions of the constitution, "the general rule is that, if the words used in a constitutional provision . . . are clear and unambiguous, they are to be construed as they are written." *Taomae v. Lingle*, 108 Hawai'i 245, 251, 118 P.3d 1188,

21. HRS § 171–3 (Supp.2005), entitled, "Department of land and natural resources," provides for the creation of the Board of Land and Natural Resources tasked to head the Department of Land and Natural Resources (the DLNR). Under HRS § 171–3, the DLNR "shall manage, administer, and· exercise control over . . . the water resources, ocean waters, . . ., coastal areas . . . and all other interests therein and exercise such powers of disposition thereof as may be authorized by law" and administer "aquatic life, aquatic life sanctuaries, public fishing areas, boating, ocean recreation, coastal programs, wildlife, wildlife sanctuaries, . . ., natural area reserves, and other functions assigned by law."

22. HRS § 171–11 (1993), entitled "Public purposes, lands set aside by the governor, management," authorizes the State, through the Governor, the power to "set aside public lands to any department or agency of the State, the city and county, county, or other political subdivisions of the State for public use or purpose."

1194 (2005) (citing *Watland v. Lingle*, 104 Hawai'i 128, 139, 85 P.3d 1079, 1090 (2004)). Thus we have stated as follows:

> [I]n interpreting a constitutional provision, the words of the constitution are presumed to be used in their natural sense . . . unless the context furnishes some ground to control, qualify or enlarge them. We have long recognized that the Hawai'i Constitution must be construed with due regard to the intent of the framers and the people adopting it, and the fundamental principle in interpreting a constitutional principle is to give effect to that intent. *This intent is to be found in the instrument itself. When the text of a constitutional provision is not ambiguous, the court, in construing it, is not at liberty to search for its meaning beyond the instrument.*

*Save Sunset Beach Coalition v. City & County of Honolulu*, 102 Hawai'i 465, 474, 78 P.3d 1, 10 (2003) (emphasis added) (citations, internal quotation marks, and brackets omitted).

The plain language of article XI, section 1 is clear and unambiguous. It provides that "the State *and its political subdivisions* shall conserve and protect Hawaii's natural beauty and all natural resources[.]" Haw. Const. Art. XI, section 1 (emphasis added). Under article VIII, section 1, entitled "Creation; Powers of Political Subdivision," "[t]he legislature shall create *counties,* and may create *other political subdivisions* within the State, and provide for the government thereof. Each political subdivision shall have and exercise *such powers as shall be conferred under general laws.*" Haw. Const. Art. VIII, sec. 1 (emphases added). Hence, as PKO observes, pursuant to article VIII, section 1 of the Hawai'i Constitution, the County is a political subdivision of the State. Accordingly, PKO is correct in stating that "as a political subdivision of the State of Hawai'i, the public trust duties imposed on the [S]tate under [a]rticle XI, section 1, also apply to the County."

The County's power under general laws with respect to its public trust duty to protect the natural water resources of the State can be found in HRS chapter 180C (1993), entitled "Soil Erosion and Sediment Control." HRS § 180C–2(a) provides that "[t]he county governments, in cooperation with the soil and water conservation districts and other appropriate state and federal agencies, *shall* enact ordinances for the purpose of controlling soil erosion and sediment." (Emphasis added.) The ordinances required must, at a minimum:

(1) Be based on relevant physical and developmental information concerning the watersheds and drainage basins of the county and/or State including but not limited to data relating to land use, soil, hydrology and geology, size of land area being disturbed, approximate water bodies and their characteristics, transportation, and public facilities and services.

(2) Include such survey of land and waters as may be deemed appropriate by the county or required by any applicable law to identify areas including multijurisdictional and watershed areas with critical erosion and sediment problems.

(3) *Contain standards for various types of soil and land uses, which standards shall include criteria, techniques, and methods for the control of erosion and sediment resulting from land disturbing activities.*

(4) Include a provision whereby standards shall be deemed met *if it can be shown that the land is being managed in accordance with soil conservation practices acceptable to the applicable soil and water conservation district directors, and that a comprehensive conservation program is being actively pursued.*

HRS § 180C–2(b) (emphases added).[23] Thus, contrary to the County's position, the plain language of article XI, section 1 man-

---

**23.** "Land disturbing activity" is defined under HRS § 180C–1 (1993), in pertinent part as "any land change which may result in soil erosion from water or wind and the movement of sediment into state waters[.]" "State waters" are defined in pertinent part under the same statute as "all waters, fresh, brackish or salt, *around and within the State, including, but not limited to, coastal waters* [.]" *Id.* (emphasis added).

dates that the County does have an obligation to conserve and protect the [S]tate's natural resources. Coupled with the State's power to create and delegate duties and responsibilities to the various counties through the enactment of statutes, the County's duty to conserve and protect is clear.

### C.

The County, however, relies on the last sentence of article XI, section 1 which reads that "[a]ll public natural resources are held in trust by *the State* for the benefit of the people," (emphasis added), in arguing that it has "no attendant obligations" under the public trust doctrine and that public trust responsibilities arise out of the "sovereign's ownership." As stated by the County in its reply brief, "[t]he omission of 'counties' as trustee is plain and unambiguous, in context" and that "[p]lainly, the State and not the Counties, hold the trust res, and the trust duties." [24]

■ In support of the interpretation of article XII, section 1 we have adopted, *supra*, this court "may look to the object sought to be established and the matters sought to be remedied along with the history of the times and state of being when the constitutional provision was adopted." *City & County of Honolulu v. Ariyoshi*, 67 Haw. 412, 419, 689 P.2d 757, 763 (1984) (citing *State v. Kahlbaun*, 64 Haw. 197, 638 P.2d 309 (1981)). Moreover, this court has stated that "a constitutional provision must be construed *in connection with other provisions of the instrument*, and also in the light of the circumstances under which it was adopted and the history which preceded it." *Waiahole I*, 94 Hawai'i at 131, 9 P.3d at 443 (emphasis added) (quoting *Hawai'i State AFL–CIO v. Yoshina*, 84 Hawai'i 374, 376, 935 P.2d 89, 91 (1997) (quoting *Carter v. Gear*, 16 Haw. 242,

244 (1904), *affirmed,* 197 U.S. 348, 25 S.Ct. 491, 49 L.Ed. 787 (1905))).

As noted in *Waiahole* I, in discussing article XI, section 7 of the Hawai'i Constitution,[25] the delegates to the 1978 Constitutional Convention elaborated on the public trust doctrine at length. The delegates proposed to replace the language "[a]ll waters shall be held by the State as a public trust for the people of Hawaii[,]" with the phrase "[t]he State has an obligation to protect, control, and regulate the use of Hawaii's water resources for the benefit of its people." In rejecting the notion that public trust obligations are coincident with ownership, it was stated as follows:

> I believe that this amendment clarifies the intent of the original committee proposal. *Many questions have arisen with regard to the term "public trust" as used in the original proposal, and this amendment is meant to clarify what I believe was stated in the committee report—that is, that the issue of water ownership was not meant to be affected by the proposal. The original proposal and this amendment do no purport to give the State ownership of all water. However, since the term "public trust" in some people's minds connotes ownership, I have introduced this amendment to provide alternative language for consideration.*

Debates, in 2 Proceedings, at 857 (statement by Delegate Fukunaga) (emphasis added). Thus, as recounted in the debates and noted in *Waiahole I*, "the delegates deleted an express reference to the 'public trust' in [a]rticle XI, section 7 because of 'some confusion generated by the [thought that] ... 'trust' implies ownership.'" 94 Hawai'i at 132 n. 29, 9 P.3d at 444 n. 29 (quoting Comm. Whole Rep. No. 19, in 1 Proceedings, at 1026). To clarify the matter of ownership, the *Waia-*

---

**24.** The County does not argue that an ambiguity exists in article XI, section 1 of the Hawai'i Constitution.

**25.** Article XII, section 7 of the Hawai'i Constitution states as follows:

> The State has an obligation to protect, control and regulate the use of Hawaii's water resources for the benefit of its people. The legislature shall provide for a water resources agency which, as provided by law, shall set *overall*

> water conservation, quality and use policies; define beneficial and reasonable uses; protect ground and surface water resources, watersheds and natural stream environments; establish criteria for water use priorities while assuring appurtenant rights and existing correlative and riparian uses and establish procedures for regulating all uses of Hawaii's water resources.
> (Emphases added.)

*hole I* court stated that "public rights under the trust do not constitute state 'ownership'[,]" *id.* (brackets omitted) (citing *Illinois Cent.*, 146 U.S. at 452, 13 S.Ct. 110, and *Robinson*, 65 Haw. at 674, 658 P.2d at 310). It was also observed that "the delegates explained that they had used 'public trust' to describe the duty of the State to actively and affirmatively protect, control and regulate water resources' and, in place of that term, substituted language that they believed *fully conveyed the theory of the public trust*." *Id.* (emphasis in original) (brackets and internal quotation marks omitted).

Hence, it appears that the proponents of amendments to article XI intended to impose upon the State *and* its political subdivision an affirmative duty to preserve and protect the State's water resources. *Cf. Waiahole I*, 94 Hawaiʻi at 133 n. 31, 9 P.3d at 446 n. 31 (rejecting the contention that the reference in article XI, section 1 to "public natural resources" indicates an intent to exclude "privately owned waters" from the public trust inasmuch as "apart from any private rights that may exist in water, 'there is as there always has been, a superior public interest in this natural bounty' " (quoting *Robinson*, 65 Haw. at 677, 658 P.2d at 312)). Accordingly, the County's argument that it has "no attendant obligations" under the public trust doctrine and that public trust responsibilities arise out of state ownership only is not correct. We therefore hold that the County has a duty, as a political subdivision of the State, to protect the waters located adjacent to the Property.

**26.** To reiterate, the court's conclusion no. 14 states as follows:

> None of the permits, approvals or authorization documents issued by the [DOH] and [the County] required a prior assessment on the effect of [Oceanside's] permitted activities on pristine waters off [the Property]. The pollution of the adjacent coastal waters were caused by [Oceanside's] ground altering activities allowed and approved by the [DOH] and [the County]. The [DOH] and [the County] did not act prudently by not affirmatively requiring an assessment prior to permit approvals or an assessment after the runoffs.

**27.** The County points out that it specifically objected to the lack of substantial evidence when it

## VII.

■ With respect to the County's argument (2), PKO failed to meet its burden to show that the County violated its public trust duties. The County specifically challenges the court's conclusion no. 14.[26] According to the County, "the record is lacking in substantial, probative evidence to sustain key factual matters which the [Plaintiffs] had the burden of proving[,]" including (1) "[t]hat the waters off [the Property] are in fact Class AA waters[,]" (2) "[t]hat the objectionable runoff into the waters off [the Property] in fact came from [the Property] and were caused by [Oceanside's] grading [activities]," (3) "[t]hat there was a lack of reasonable erosion control measures at [the Property]," (4) "[t]hat the actions or inactions of [the County] caused any damage to the coastal waters," and (5) "[t]hat the [County] ha[s] any duty, in issuing and monitoring ministerial grading and grubbing permits, to take affirmative action to make pre-permit or post-flood event assessments of the specific effect of development on coastal resources." [27] PKO's arguments that substantial evidence exists as to points (1), (2), and (5) are persuasive. However, as the County argues, points (3) and (4) are unsupported by the record.

### A.

■ As to its point (1), the County does not challenge the court's finding no. 15 that the "ocean waters bordering the subject property are classified as Class AA open coastal waters pursuant to Title 11, Chapter 54, amended Administrative Rules of Water

filed its September 30, 2002 "Notice of Submission of Findings of Fact and Conclusions of Law Regarding The Trial on Counts II and V." In that document, the County proposed that the court enter the following conclusion of law:

> *CONCLUSIONS OF LAW*
> If it should be determined that any of these Conclusions of Law should have been set forth as Findings of Fact, then they will be deemed as such.
> . . . .
> *2. PKO has failed to establish that Defendants Lee and County breached their public trust duty to PKO who use, or would use, and enjoy the marine waters and other natural resources associated with it.*

(Emphases added.)

Quality Standards, the highest designation for water quality." Generally, a court finding that is not challenged on appeal is binding upon this court. *See Bremer v. Weeks*, 104 Hawai'i 43, 63, 85 P.3d 150, 170 (2004) (holding that "findings of fact ... that are not challenged on appeal are binding on the appellate court"); *Robert's Hawaii School Bus, Inc. v. Laupahoehoe Transp. Co.*, 91 Hawai'i 224, 239, 982 P.2d 853, 868 (1999) (holding that "[f]indings of fact that are unchallenged on appeal are the operative facts of a case"); *Kawamata Farms, Inc. v. United Agri Prods.*, 86 Hawai'i 214, 252, 948 P.2d 1055, 1093 (1997) (stating that "[i]f a finding is not properly attacked, it is binding; and any conclusion which follows from it and is a correct statement of law is valid" (quoting *Wisdom v. Pflueger*, 4 Haw.App. 455, 459, 667 P.2d 844, 848 (1983))). Moreover, PKO correctly points out in its answering brief that, as indicated under HAR § 11–54–6(a)(2)(A),[28] the State expressly classifies the ocean waters abutting the Property, Kealakekua Bay, as "Class AA" waters. Accordingly, we need not disturb the court's finding no. 15 that the ocean waters bordering the Property are "Class AA" waters.

With respect to point (2), again the County does not challenge any finding to support its contention. The court, in its finding no. 38, found that PKO's witness, Leslie, testified that on two occasions, once in September 2000 and once in November 2000, he "saw dirt and silt covering the shoreline face, runoff flowing into the ocean and muddy water in the ocean." Additionally, the court observed in finding no. 39 that Leslie testified to seeing "mountains of sand, cinder, and soil, about 150–200 yards from shore on the [Property], and that the shore had been affected by the runoff." Hence, inasmuch as the County fails to challenge these findings, it is settled that the Property was the source of runoff pollution.

As to point (5), HRS § 180C–2(a) imposes an affirmative duty on the part of the County to enact ordinances "for the purpose of controlling soil erosion and sediment." Such ordinances are required to meet certain minimum requirements including the inclusion of a provision "whereby standards shall be deemed met *if it can be shown that the land is being managed in accordance with soil conservation practices* ... and that a comprehensive conservation program *is being actively pursued.*" HRS § 180C–2(b) (emphases added). A plain reading of HRS § 180C–2 manifests an intent on the part of the legislature that the various counties actively monitor and ensure that standards designed to address soil conservation practices are actually met and carried out.[29]

Therefore, an affirmative duty to ensure that conditions designed for effective soil erosion control is being met by a land developer is imposed upon the County. A statutory mandate to ensure that the land "is being managed in accordance with soil conservation practices," *id.*, and to ascertain "that a comprehensive conservation program is being actively pursued[,]" *id.*, would be rendered meaningless if the County were excused from the obligation "to take affirmative action to make pre-permit or post-flood event assessments" as it contends. Contrary to the County's position, therefore, a duty "to take affirmative action to make pre-permit or post-flood event assessments of the specific effect of development on coastal resources" exists under the HRS.

A review of HCC, chapter 10 similarly reveals that the County has the duty to protect the Class AA waters adjacent to the Property. HCC § 10–16 provides that "[n]o construction of any structure upon the premises involved shall be permitted *until the director of public works has received the notice of completion that the grading, grub-*

28. *See supra* note 6.

29. The County also argues that "PKO points to nothing in [HRS c]hapter 180C which mandates County public trust duties." However, the legislative history to HRS chapter 180C indicates that the legislature intended "to conserve and protect the land, water, and other resources of the State" by requiring "the county governments to enact ordinances for the purpose of controlling soil erosion and sediment[.]" Hse. Stand. Comm. Rep. No. 234–74, in 1974 House Journal, at 647. Hence, pursuant to HRS chapter 180C, the various counties do have statutory public trust duties.

*bing, or stockpile work has been completed in accordance with the grading permit."* (Emphasis added.) HCC § 10–20 mandates that "[t]he maximum area of land that may be cleared for grading or grubbing is twenty acres[,]" and that "[a]dditional area *shall not be cleared for grading or grubbing until measures to prevent dust or erosion problems in the area already graded or grubbed have been completed."* HCC § 10–26 further directs that "[a]ll grading, grubbing, and stockpiling permits and operations *shall* conform to the erosion and sedimentation control standards and guidelines established by the department of public works in conformity with [HRS chapter 180C]." (Emphasis added.) Hence, HCC chapter 10 requires that both the County and Oceanside ensure that all measures to prevent potential erosion and runoff be in place both prior to construction of structures and prior to any grading or grubbing exceeding the twenty-acre limit. As such, the County's point (5) is not well taken.

### B.

As to points (3) and (4), we agree with the County that no substantial and probative evidence was admitted to show a lack of reasonable erosion control measures at the Property or that actions or inactions of the County caused any damage to coastal waters. In contending that there was evidence of a lack of erosion control measures, PKO cites DOH's NFVO which states that, "[o]n or about September 9, 2000, Oceanside discharged presently unknown amounts of storm water ... from [the Property] in Kona into the Pacific Ocean." PKO, in arguing that substantial evidence exists to disprove the County's point (4), relies on an affidavit from Nancy Burns (Burns), a project engi-

neer of Oceanside, attached to which is a report from Galen Kuba (Kuba), Engineering Division Chief of the Department of Public Works, County of Hawai'i, indicating that "the source of the runoff was not only from the construction site," and that "some of the ECP measures ... [were] not in place[.]"

The County objects to the use of the affidavit by Burns on the ground that the affidavit was not admitted into evidence during trial.[30] We observe, also, that while the documents relied upon by PKO were entered during the temporary restraining order and permanent injunction phase of the proceedings, they were not submitted during the trial on Count II. Thus, the NFVO, Burns' affidavit, and Kuba's report were not entered into evidence at the Count II trial. As the County argues, even if considered, the NFVO merely recounts allegations of fact and violations by Oceanside. The NFVO would not have established that the offending runoff was caused by the failure of any County approval, or the inadequacy of specific runoff control measures. It appears that no evidence was entered establishing a failure by the County to make appropriate assessments prior to the issuance of any approval or permit as concluded by the court in conclusion no. 14. Accordingly, inasmuch as the record is devoid of evidence adduced at trial that there was a lack of reasonable erosion control measures or that the County failed to make appropriate assessments, the court's conclusion no. 14 cannot be sustained. We hold, then, that on the evidence before it at the Count II trial the court erred in concluding that the County breached its public trust duties.[31]

### VIII.

We next turn to DOH's appeal. In its argument (1), that the court misapplied the

---

**30.** DOH and PKO make similar arguments as to the evidence, or lack thereof, regarding DOH's liability for public trust duties. *See* discussion *infra* in part IX.B.

**31.** The County further opposes PKO's reliance on these documents, stating that the NFVO merely contained "allegations of fact and violations by Oceanside[,]" and the documents were presented during the preliminary injunction phase to which "the County was never a party." Assuming such evidence could be considered, it would be funda-

mentally unfair for evidence entered during such proceedings to be used against the County inasmuch as the County was not a party to the preliminary injunction phase. *See In re Drew,* 637 S.W.2d 772, 778 (Mo.App.1982) (stating that "[a] party is entitled to have the merits of his case reviewed upon the evidence properly introduced at the trial of his present claim and the trial court should not take into account evidence which the party has had no opportunity to refute, impeach or explain").

public trust doctrine as to DOH, DOH relates that "[t]he [Permit] prohibited Oceanside's illegal discharges ... [and] required Oceanside to use [BMPs] and to install erosion control measures"; "DOH then brought an enforcement action, nineteen days after the second runoff event, for Oceanside's violations of state law"; and that DOH "entered into a stipulated permanent injunction with PKO and Oceanside that established a water monitoring program and prohibited Oceanside from further polluting pristine state waters."

According to DOH, its "decisions regarding how to best implement HRS chapter 342D, and when and how to bring an administrative enforcement action, go to the heart of the discretionary exercise of DOH's police powers," and "are best left to the executive agency." In this regard, DOH maintains that the court "erred by circumventing DOH's discretion and second-guessing how DOH should have exercised its police powers—particularly in the absence of competent evidence." DOH adds that the public trust doctrine "is a powerful and potentially far-reaching tool" which "should be applied only where the executive branch is clearly *violating the constitution.*" (Emphasis in original.)

On the other hand, PKO maintains that "[a]s the trustee of Hawaii's natural resources, the State of Hawai'i has delegated to DOH primary trust responsibility for, among other things, the quality of Hawaii's waters." PKO adds that "[t]his undeniable fact is clearly evidenced in at least two state statutes, HRS [c]hapter 342D, *Water Pollution,* and HRS [c]hapter 342E, Nonpoint Source *Pollution and Control.*" (Emphases in original.)

HRS § 342D–4 (Supp.2005), entitled "Duties, rules," provides in pertinent part that "[i]n addition to any other power or duty prescribed by law and in this chapter, the director [of DOH] *shall* prevent, control, and abate water pollution in the State." (Emphasis added.) HRS § 342D–6(c) (Supp.2005) provides in pertinent part that "the [DOH] director *shall* issue a permit ... *if the director determines that it will be in the public interest[.]*" In determining the public inter-

est, HRS § 342D–6(g) prescribes that the director "*shall* consider" the following factors:

[(1)] the environmental impact of the proposed action, [(2)] any adverse environmental effects which cannot be avoided should the action be implemented, [(3)] the alternatives to the proposed action, [(4)] the relationship between local short-term uses of the environment and the maintenance and enhancement of long-term productivity, [(5)] any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented, and [(6)] any other factors which the director, by rule, may prescribe; provided that any determination of public interest shall promote the optimum balance between economic development and environmental quality.

PKO also supports its contention that the DOH has statutory duties to protect the public trust, as follows:

In the performance of its duties to "prevent, control, and abate" the pollution of Hawaii's waters, HRS [§ ] 342D–8, [entitled "Inspection of premises,"] for example, authorizes the [d]irector of ... DOH to "enter and inspect any building or place [in order to a]scertain compliance or non-compliance with [HRS chapter 342D], any rule or standard adopted by the [DOH] pursuant to [HRS chapter 342D], or any permit or other approval granted by the [DOH] pursuant to this chapter ... [and] make reasonable tests in connection therewith."

Similarly, HRS § 342E–3(a) (1993), entitled "Powers and duties of the director," provides in pertinent part as follows:

In addition to any other power or duty prescribed by law, the director *shall:*

(1) *Reduce, control, and mitigate nonpoint source pollution in the State;*

(2) *Adopt rules under chapter 91 necessary for the purposes of this chapter, which may include water quality standards for specific areas, types of nonpoint source pollution discharges, or management measures in the*

*control of water pollution, allowing for varying local conditions;*

(3) Develop plans, recommendations, and policies, and provide other support to further the State's capacity to carry out the requirements of any federal law, rule, or regulation pertinent to the management or mitigation of nonpoint source pollution;

(4) Work cooperatively with other state, county, and federal agencies, to facilitate the monitoring of and update the list of waters in the State that cannot reasonably be expected to attain or maintain state water quality standards and goals established under the federal Water Quality Act of 1987 ... without additional action to control nonpoint source pollution;

(5) *Identify those categories of nonpoint sources that add significant pollution to the state waters identified under paragraph (4);*

(6) *Facilitate implementation of the [BMPs], programs, and measures to control each category of nonpoint source pollution identified under paragraph (5), and encourage nonpoint source pollution mitigation practices including, but not limited to, the use of non-hazardous substances in the household and agroforestry management;*

. . . .

(8) Convene statewide and regional public forums involving the general public, the regulatory community, *and businesses and industries that may contribute to categories of nonpoint source pollution for the purpose of establishing plans, and developing management strategies and other mitigation measures to control and manage nonpoint source pollution;*

. . . .

(12) Review environmental assessments and environmental impact statements as defined under [HRS § 343–2[32]] for the purposes of commenting on the effects that a proposed action would have on the level of nonpoint source pollution generated in an area.

(Emphases added.)

▮▮▮▮ Although in some respect, exercise of DOH's authority is discretionary in nature, such discretionary authority is circumscribed by the public trust doctrine. As this court has stated:

The State unquestionably has the power to accomplish [assurance of the continued existence and beneficial application of the state's natural water resources for the common good] through its police powers. *We believe however that the king's reservation of his sovereign prerogatives respecting water constituted much more than a restatement of police powers, rather we find that it retained on behalf of the people an interest in the waters of the kingdom which the State has an obligation to enforce and which necessarily limited the creation of certain private interests in waters.*

*Robinson,* 65 Haw. at 674 n. 31, 658 P.2d at 310 n. 31 (emphasis added). In addition, it has been said with regard to the State's obligation to balance competing public and private interests in water resources that "[h]aving recognized the necessity of a balancing process, we do not suggest that the state's public trust duties amount to nothing more than a restatement of its prerogatives, nor do we ascribe to the constitutional framers the intent to enact laws devoid of any real substance and effect." *Waiahole I,* 94 Hawai'i at 142, 9 P.3d at 454 (citing *Robinson,* 65 Haw. at 674 n. 31, 658 P.2d at 310 n. 31).

**32.** HRS § 343–2 (Supp.2005) defines "environmental impact statement" in pertinent part, as follows:

[A]n informational document prepared in compliance with the rules adopted under HRS § 343–6 and which discloses the environmental effects of a proposed action, effects of a proposed action on the economic welfare, social welfare, and cultural practices of the community and State, effects of the economic activities arising out of the proposed action, measures proposed to minimize adverse effects, and alternatives to the action and their environmental effects.

Hence, we are not convinced by DOH's argument that its duties under the public trust doctrine are undertaken in its "absolute" discretion. As this court in *Waiahole I* noted, "The duties imposed upon the state are the duties of a trustee and not simply the duties of a good business manager." *Id.* at 143, 9 P.3d at 456. As guardian of the water quality in this state, DOH then "must not relegate itself to the role of a 'mere umpire' . . . but instead must take the initiative in considering, protecting, and advancing public rights in the resource at *every stage* of the planning and decision-making process." *Id.* (emphasis added). Thus, "the state may compromise public rights in the resource *pursuant only to a decision made with a level of openness, diligence, and foresight commensurate with the high priority these rights command under the laws of our state.*" *Id.* (emphasis added). Such a duty requires DOH to not only issue permits after prescribed measures appear to be in compliance with state regulation, but also to ensure that the prescribed measures are actually being implemented after a thorough assessment of the possible adverse impacts the development would have on the State's natural resources. This duty is consistent with the constitutional mandate under article XI, section 1 and the duties imposed upon DOH by HRS chapters 342D and 342E. Accordingly, we hold that the court's application of the public trust doctrine was correct.

## IX.

### A.

In its argument (2), DOH contends that insufficient evidence exists to support the court's conclusion nos. 12, 14, and 19 that DOH breached its public trust duties with respect to the runoff from the Property into the Class AA waters adjacent to it. According to DOH's opening brief, the court "repeatedly concluded that DOH *authorized* ground-altering activities that led to Oceanside's pollution of Class AA waters. Yet at trial, PKO failed to admit [sic] documentary or testimonial evidence that DOH issued any permit or authorization to Oceanside." (Emphasis added.) DOH specifically challenges the court's finding no. 20 that states as follows:

The DOH *permit, Form C entitled "Notice of Intent (NOI) for Discharges"* of storm waters associated with construction activity *prohibited* [Oceanside] to discharge any sediments or topsoil brought to the subject property into the offshore Class AA waters. This *permit* is issued under [HRS] Chapter 342D.

(Emphases in original.) According to DOH, this finding is incorrect because the NOI was not in evidence and, "[m]ore importantly, it was not a permit." In addition, DOH appeals findings nos. 17, 18, 19, 21, and 22 to the extent that the court referred to permits and approvals by DOH. This referral, DOH argues, led the court to make the aforesaid incorrect conclusions of law which are reiterated here:

12. Under [HRS] chapter 342D–4 the Director of Health is to prevent, control, and abate water pollution in the state. This section authorizes the Director of Health to adopt [c]hapter 91 rules and is in addition to any other power or duty prescribed by law. Whatever erosion control measures implemented by Oceanside pursuant to [DOH] or [County] permits or approvals stem from HRS 342D and is [sic] insufficient to meet the mandate of the public trust doctrine.

. . . .

14. None of the permits, approvals or authorization documents issued by [DOH and County] required a prior assessment on the effect of [Oceanside's] permitted activities on pristine waters off [the Property]. The pollution of the adjacent coastal waters were caused by [Oceanside's] ground altering activities allowed and approved by the [DOH] and [the County]. The [DOH] and [County] did not act prudently by not affirmatively requiring an assessment prior to permit approvals or an assessment after the runoffs.

. . . .

19. Plaintiffs have proven by a preponderance of the evidence that [DOH] and [County] violated their duties as public trustees by not protecting the adjacent coastal waters from pollution.

DOH concedes that the Permit and the NOI were attached as exhibits to two of its pretrial pleadings. Nevertheless, DOH asserts that "[e]vidence necessary to establish an ultimate fact in controversy as essential to judgment *must come before the court during trial*—not before and not after." (Emphasis added.) (Quoting *Mann v. Russell's Trailer Repair, Inc.*, 787 N.E.2d 922, 928 (Ind. 2003).).

Hence, DOH contends that "because PKO admitted [sic] almost no facts regarding Count II during trial, DOH had no opportunity to rebut the findings it has appealed." (Citing *Miller v. Tanaka*, 80 Hawaiʻi 358, 365, 910 P.2d 129, 136 (App.1995) (holding that the failure to afford a petitioner the opportunity to rebut evidence and cross-examine a witness violated his due process rights)). PKO asserts that the NFVO is "part of the record upon which the court could have relied to render its ruling and upon which this [c]ourt may affirm those rulings." DOH argues, however, that the court's "reliance on the NFVO would not have been enough to prove PKO's case under Count II" and that such "factual errors directly impacted DOH's constitutional rights, [which] were not harmless, and should be reversed."

In response, PKO maintains that "even if the ... court gave 'the wrong reason for its ruling' ... as long as its conclusion that DOH violated the public trust is correct, this [c]ourt 'may affirm the trial court's judgment on any ground in the record that supports affirmance.' " (Quoting *Poe v. Hawaiʻi Labor Relations Bd.*, 87 Hawaiʻi 191, 197, 953 P.2d 569, 575 (1998) (citing *Reyes v. Kuboyama*, 76 Hawaiʻi 137, 140, 870 P.2d 1281, 1284 (1994) and *Enos v. Pac. Transfer & Warehouse, Inc.*, 79 Hawaiʻi 452, 459, 903 P.2d 1273, 1280, *reconsideration denied*, 80 Hawaiʻi 187, 907 P.2d 773 (1995))).

### B.

According to DOH, on October 17, 2002, "the court clarified that only the evidence admitted at trial, and not evidence admitted during the preliminary injunctions phase, was considered during the burials trial [which included Count II]." However, a read-ing of that order indicates that DOH is incorrect. As earlier observed in section VII, *supra*, the court's October 17, 2002 order ruled that evidence admitted during trial for Count X and the burials trial "shall be deemed to be a part of the record *for the remedies trial* and need not be readmitted or reintroduced." (Emphasis added.) As also stated previously, the remedies phase was held "for remedies that may be afforded the prevailing party or parties on Counts II, V, VI, VII and X of the [Complaint]." A review of the record indicates that the trial on the merits on Count II, where the issue of the County's and DOH's liability was before the court, had already taken place and was completed in September 2002. The October 17, 2002 order was made pursuant to HRCP Rule 16 which provides that an order thereunder "shall control the subsequent course of the action." Thus, the order did not relate to proceedings already held. Therefore, the October 17, 2002 order had no relevance to the presentation of evidence as to Count II that began in July 2002, and had already been completed by the date of the order.

■ However, PKO is also incorrect in stating that the court could have considered the NFVO, the affidavit of Burns, and the report by Kuba in deciding whether DOH was liable for breach of its public trust duties because the documents were in the record. As noted before, PKO relies on *Poe* for this contention. However, its argument that affirmance of the court's judgment may be had on any ground in the record that supports affirmance is incorrect. *Poe* was an appeal of the circuit court's affirmance of a grant of summary judgment by the Hawaiʻi Labor Relations Board (HLRB). *See Poe*, 87 Hawaiʻi at 196–97, 953 P.2d at 574 (upholding the circuit court's affirmance of the HLRB's grant of summary judgment on the ground that employer could prohibit employee from participating in a strike under HRS § 89–12(a) (1993) despite the circuit court's reliance on other grounds). In the same light, *Reyes* also involved an appeal of a grant of summary judgment. *See Reyes*, 76 Hawaiʻi at 140–41, 870 P.2d at 1284–85 (ruling that the court's grant of summary judgment was based on erroneous reasoning that defendant

owed no duty to plaintiff but affirming summary judgment on other grounds). *Enos* concerned the lack of specific findings by the trial court in sanctioning an attorney under HRCP Rule 11. *See Enos,* 79 Hawai'i at 459, 903 P.2d at 1280 (holding inapplicable the rule that "[a]n appellate court may affirm a judgment of the lower court on any ground in the record which supports affirmance" inasmuch as evidence on the record to justify the imposition of sanctions against a party's counsel did not support affirmance). PKO does not identify any case wherein a trial court's final judgment was affirmed on appeal based on evidence not entered at trial but located somewhere in the record.

 DOH's contention that PKO failed to meet its burden in demonstrating that DOH failed to make pre-permit assessments or an assessment after the runoff pollution thus remains persuasive. It has been settled that a plaintiff "must bear the burden of proving all of the elements of [his] or her case." *Ho v. Leftwich,* 88 Hawai'i 251, 257, 965 P.2d 793, 799 (1998). DOH argues that "[t]he only evidence that PKO identifies to prove the alleged constitutional violations is the NFVO" which, it states, "established that Oceanside violated state law and that DOH brought a timely and appropriate administrative enforcement action." The NFVO was not submitted at trial. Had it been, DOH maintains that the NFVO "is not a substitute for the Permit itself or for the NOI, which shows Oceanside's erosion control measures and BMPs," inasmuch as the NFVO "does not detail most of the permit conditions," and "does not show what DOH did or did not do regarding its regulatory oversight of the development." As indicated previously, neither the Permit nor the NOI were introduced at the Count II trial.

DOH contends that other than the testimony of Leslie and Medeiros, "PKO presented no other testimonial or documentary evidence regarding Count II." We also note that, during closing arguments, the court asked PKO's counsel to indicate where in the record PKO had proven that DOH had issued a permit or authorization to Oceanside which preceded the pollution of the Class AA waters, but counsel only referred to the undisputed fact of the water pollution, the alleged failure of DOH to permit PKO's members to participate in a contested case hearing regarding the issuance of the NFVO, and to the Count V claim that DOH violated PKO's traditional and customary native Hawaiian rights.

DOH further asserts that "the impact of water pollution on coastal waters, and the federal and state standards for environmental protection and antidegradation are technical requirements . . . yet PKO did not introduce expert or other testimony showing what standards DOH and Oceanside should have followed; what regulatory activities DOH should have taken; and specifically, what regulatory measures DOH failed to take." On appeal, PKO does not dispute that expert testimony should have been proffered. PKO did not introduce such testimony at the trial on Count II.

Finding nos. 17–22, then, are clearly erroneous insofar as the court found that DOH issued approvals or authorizations for Oceanside's construction activities when no evidence of any approval or authorization was submitted in evidence. *See Kienker,* 110 Hawai'i at 105, 129 P.3d at 1133 (stating that a finding of fact is "clearly erroneous when . . . the record lacks substantial evidence to support the finding or determination"); *Hawaii Prince Hotel Waikiki Corp. v. City & County of Honolulu,* 89 Hawai'i 381, 388, 974 P.2d 21, 28 (1999) (ruling that "[a] finding of fact is clearly erroneous when it is not supported by substantial evidence or an appellate court is left with a definite and firm conviction that a mistake has been made" (citations and internal quotation marks omitted)); *see also Celadon Trucking Serv's, Inc. v. Titan Textile Co.,* 130 S.W.3d 301, 307 (Tex.App.2004) (holding that "on appeal from a trial on the merits," appellate court cannot consider "summary-judgment evidence that was not admitted in evidence at trial"); *Greenfield v. Lykes Bros. S.S. Co.,* 848 So.2d 30, 33 (La. App.2003) (stating that neither the trial court nor the appellate courts can consider documents that were "never properly offered, introduced, or admitted into evidence," as "[u]ntil such evidence is introduced, the opposing party has no opportunity to legally

confront possibly determinative evidence"); *David v. Cajun Painting, Inc.*, 631 So.2d 1176, 1181 (La.App.1994) (ruling that "[e]vidence filed into the record, but not introduced formally at trial, may not be considered by the appellate court"); *Imprint Techs., Inc. v. Comm'r of Economic Sec.*, 535 N.W.2d 372 (Minn.App.1995) (ruling that "matters not received into evidence at the trial may not be considered on appeal"); 1 John W. Strong, et. al., *McCormick on Evidence*, § 51, at 194 (4th ed.1992) (noting that the adversarial system "imposes on the parties the burden of presenting evidence *at the trial* pursuant to rules and practices that make it clear when proof has been presented so that it is officially introduced and thereupon can be considered by the trier of fact in the resolution of fact issues" (emphasis added)).

Inasmuch as the court's conclusion nos. 12, 14, and 19 "flowed from an incorrect interpretation of the NOI, a permit application, that was not in evidence at trial," as DOH contends, such conclusions are incorrect as a matter of law. We therefore hold that PKO failed to sustain its burden of showing a breach of public trust duties on the part of DOH by a preponderance of the evidence, as the court determined. *See Santos v. Perreira*, 2 Haw.App. 387, 393, 633 P.2d 1118, 1124 (1981) (ruling that "[t]he trial court's error is reversible error only if . . . all of the competent evidence is insufficient to support the judgment").

## X.

Because PKO failed to sustain its burden in showing that both the County and DOH breached its public trust duties, we need not address the court's application of *Ka Pa'akai* in granting relief to the Plaintiffs.

## XI.

In accordance with this opinion, we affirm the court's March 14, 2006 Fourth Amended Final Judgment to the extent that it properly applied the public trust doctrine with respect to the County and DOH, but reverse as to

the County and DOH's liabilities for breach of their public trust duties.